FRANCIS W. DUNBAR *et al.* Appellants, *vs.* THE AMERICAN TELEPHONE AND TELEGRAPH COMPANY *et al.* Appellees.

*Opinion filed February 19, 1909.*

1. EVIDENCE—*when violation of the Anti-trust law need not be proved.* To maintain a bill to set aside a purchase of stock by a corporation upon the ground that its purpose and tendency was to restrict competition and that it was illegal and void because contrary to the public policy of the State, it is not necessary to prove a violation of the Anti-trust law, nor is it necessary, in order to justify a decree in favor of the complainants, that the proof shall establish the averments of the bill beyond a reasonable doubt.

2. CORPORATIONS—*corporation cannot purchase stock in another corporation.* Neither a foreign corporation nor a domestic one can lawfully become a stockholder in another corporation unless such power is expressly given or necessarily implied; and especially is this true where the object is to obtain the control of such other corporation.

3. SAME—*extent of a corporation's implied power to purchase stock in other corporations.* There is no provision of the general Incorporation act authorizing one corporation to purchase and hold stock in another corporation, and there is no implied power to do so except where it is necessary to carry into effect the object for which such corporation was formed.

4. SAME—*a purchase of stock by a corporation to create a monopoly is void.* A purchase of stock by a corporation for the purpose of obtaining a controlling interest in a competing company and stifling competition is *ultra vires* and void and not merely voidable, and hence all contracts entered into in pursuance of such purpose are mere nullities and the title to the stock does not pass from the sellers.

5. SAME—*the right of minority stockholders to relief.* Where a controlling interest in a corporation has been purchased by another corporation for the purpose of stifling competition, the minority stockholders in the former corporation may have the sale set aside in equity and may compel the stock to be returned to the rightful owners upon equitable terms, and their right to relief is not limited to enjoining the purchasing corporation from voting the stock and from exercising or enjoying the other rights of a stockholder.

6. SAME—*when a cross-bill by selling stockholder is not necessary to justify granting him relief.* Where a bill by minority

stockholders to set aside a sale of the controlling interest in the corporation to another corporation makes the selling stockholder a party defendant without asking relief against him, if he answers admitting the allegations of the bill no cross-bill is necessary to authorize the court to grant him affirmative relief by way of setting aside the sale and compelling a return of his stock, as such relief is merely incidental to the complete relief to which the complainants are entitled as minority stockholders.

7. RES JUDICATA—*when dismissal of cross-bill is not an adjudication of right to relief.* The dismissal of a cross-bill for want of equity is not an adjudication that the cross-complainant has no rights in the subject matter of the litigation, where the circumstances are such that the cross-bill was unnecessary in order to obtain the relief sought by it.

8. PUBLIC POLICY—*agreements tending to promote monopoly are opposed to public policy.* Agreements made by persons or corporations engaged in a business impressed with a public character which tend to prevent competition and create monopoly in such business are opposed to the public policy of the State.

9. SAME—*when fact that parties may be in pari delicto does not preclude relief.* Where the purchase of stock by a corporation has an inevitable tendency to stifle competition and create monopoly in a business impressed with a public character a question of public policy is involved, and a court of equity may grant full relief by setting aside the transaction and compelling a return of the stock upon equitable terms, even though the selling stockholders and the purchasing corporation may have been *in pari delicto.*

10. PARI DELICTO—*when selling stockholder and purchasing corporation are not in pari delicto.* That the attorney in fact of the owner of stock in a corporation has, without the knowledge of such owner, intrigued with a competing corporation and made a sale of such stock to it to give it a controlling interest and enable it to stifle competition, does not render such owner *in pari delicto* with the purchasing corporation, particularly where he disapproved the sale upon learning thereof and sought to buy back the stock at an advance.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

HENRY S. ROBBINS, for appellants.

A. N. WATERMAN, and HOLT, WHEELER & SIDLEY, for appellees the American Telephone and Telegraph Company and Enos M. Barton; CHARLES H. ALDRICH, and HENRY S. McAULEY, for appellee Milo G. Kellogg; TENNEY, COFFEEN, HARDING & SHERMAN, for appellees Wallace L. DeWolf; Hopkins J. Hanford and Franz J. Dommerque; JOHN J. HERRICK, for appellee Clarence Buckingham.

Mr. JUSTICE VICKERS delivered the opinion of the court:.

Francis W. Dunbar and others, minority stockholders of the Kellogg Switchboard and Supply Company, (hereinafter called the Kellogg company,) filed a bill in equity in the circuit court of Cook county against the American Telephone and Telegraph Company, (hereinafter called the American company,) the Western Electric Company, (hereinafter called the Electric company,) the Kellogg Switchboard and Supply Company, Milo G. Kellogg, Wallace DeWolf, and others, for the purpose of having a sale of the majority of the stock of the Kellogg Switchboard and · Supply Company made by Milo G. Kellogg and others to the American company, set aside and held for naught and for an injunction and other relief. Milo G. Kellogg answered the bill, in which he substantially admitted all its averments, and filed a cross-bill, in which he repeated, with some variations and additions, the substantial averments of the original bill, and prayed that the pretended sale of the capital stock held by him in the Kellogg company should be adjudged illegal and void and be canceled and set aside. Some of defendants below answered both the bill and the cross-bill, while others demurred to both. The demurrers were sustained and the bills both dismissed for want of equity. This decree was affirmed by the Appellate Court, but upon further appeal to this court the decree sustaining the demurrer and dismissing the original bill was reversed, while the decree dismissing the cross-bill on demurrer was

affirmed. This court remanded the cause to the circuit court, with directions to proceed in conformity with the views of this court expressed in its opinion. Our former opinion is reported as *Dunbar* v. *American Telephone and Telegraph Co.* 224 Ill. 9. Upon the re-instatement of the cause in the circuit court most of the defendants who had not already filed answers, answered the bill. Those not answering were either mere formal parties, or parties whose interests were represented and protected by the answers filed. After the issues were made up the cause was heard in the circuit court, the Hon. Thomas G. Windes presiding, upon oral evidence taken in open court, except certain portions of the testimony which was submitted in depositions. The findings of the circuit court were that the allegations of the bill were substantially true, and by its decree the purchase of the stock of the Kellogg company by the American company was declared void and of no effect and the relief granted was such as the court deemed equitable, proceeding upon the assumption that the title to the stock of the Kellogg company had never passed out of the persons who made the alleged sales to the American company. The scope of the decree of the circuit court, both in its findings and its equity-adjusting features, will be more specifically stated hereinafter. Upon a writ of error being sued out of the Appellate Court, that court, while agreeing in the main with the circuit court in its findings, disagreed with the relief granted, and accordingly reversed the decree and remanded the cause to the circuit court, with directions to enter a decree in accordance with the specific directions expressed in the opinion of the Appellate Court. The complainants in the original bill have appealed to this court, and here insist upon a reversal of the Appellate Court and an affirmance of the circuit court. Milo G. Kellogg has assigned cross-errors, as have also the American company and Enos M. Barton. The cross-errors assigned by Kellogg do not materially differ from the errors assigned by

appellants, while the cross-errors assigned by the American company and Barton bring in question the decree of the circuit court.

Upon the former hearing of this cause in this court the substance of the bill filed by appellants was set out in the statement preceding the opinion. Since the American company and others question by cross-errors the sufficiency of the evidence to support appellants' bill, it will be necessary to re-state the essential features of the bill upon which the cause was finally heard.

Appellants allege in their amended and supplementary bills that the Kellogg company was an Illinois corporation, organized for the purpose of manufacturing, selling, hiring, leasing, or otherwise procuring, owning and disposing of, electric telephone and telegraph instruments of all kinds; that the capital stock consisted of 5000 shares, of $100 each; that Wallace L. DeWolf was the president, E. H. Brush the vice-president and Leroy D. Kellogg the secretary and treasurer of the company; that upon its organization Milo G. Kellogg became the principal stockholder, owning about two-thirds of the capital stock. It is further alleged that the American company was a corporation organized under the laws of New York, and was doing business in this State and most of the other States of the Union; that said last named company had become the owner of the business and stock of the American Bell Telephone Company of Boston, and that F. P. Fish was its president; that the American company was the owner of a large amount of stock of numerous licensee or subsidiary telephone companies and operated a large system of telephone and telegraph lines in the United States; that said American company owned a majority of the capital stock of the Electric company; that said corporation and the Electric company formed what is known as the "Bell Telephone Monopoly," which for many years had exclusive control of the business in the United States as to the use of both telephone and tele-

graph apparatus, due to the numerous patents owned and controlled by said American company; that the president of the American company is also a director of the Electric company; that the Electric company is an Illinois corporation, engaged in the manufacturing, buying and selling of electric apparatus used in the construction, operation and maintenance of telephone and telegraph systems; that E. M. Barton is president of said Electric company, and that he is dominated by Fish and the American company through the latter's control of the board of directors of said Electric company. It is further alleged in the bill that telephones, switchboards and instruments and other apparatus of the independent telephone companies throughout the United States have been manufactured by a number of companies, the most important of which are the Kellogg company and the Stromberg-Carlson company, both of which are located in Chicago, and each of which exceeds in capacity the business of any other telephone manufacturing company in the United States except the Electric company; that the business of the Kellogg company exceeded that of the said Stromberg-Carlson company in supplying switchboards and other apparatus for the larger independent exchanges throughout the country; that in consequence of the conditions and circumstances thus stated, it is charged in the bill that in order to stifle competition and create a monopoly in itself and its licensee companies and to enable them to exact unreasonable and excessive rates and charges, the American company conceived the illegal purpose of acquiring at least two-thirds of the stock of the Kellogg company, and through said ownership to elect and maintain a board of directors which should not act in the real interest of the Kellogg company but in the interest of and subservient to the interest of the American company, and thereby free that company and its licensees from the competition of the Kellogg company and independent exchanges. The bill charges, on information and belief, the method that said

American company contemplated adopting to accomplish its unlawful purpose. The bill then sets out the circumstances under which the American company acquired, by purchase from DeWolf, an agent of Milo G. Kellogg, 3307 shares of the Kellogg company stock, and the acquirement, with like unlawful purpose, of 1004 other shares of stock from other stockholders in the said Kellogg company. The bill charges that these purchases were made by Barton, president of the Electric company; that the money to pay for said stock was furnished by the American company, and that the stockholders of the Kellogg company of whom these shares were purchased by Barton were ignorant of the fact that they were selling to the American company. It is charged that by the contract entered into between DeWolf and Barton in regard to. the sale of the Kellogg shares, Barton agreed to pay $45 per share in cash upon the delivery of the certificates, and also to pay, in addition, per share, the proceeds of any and all bills and accounts receivable due and owing to said Kellogg company on December 1, 1901, amounting to $323,248.09, as the same are paid and collected; that it was also agreed that the business. of the Kellogg company should be carried on in the usual manner for the space of one year; that these transactions were all consummated while Milo G. Kellogg was in California on account of ill-health and without his knowledge or personal participation therein, and that as soon as he learned of said sale he heartily disapproved thereof and sought in every way to re-purchase his stock, in order that the Kellogg company might be managed in the interest of its stockholders and not to be used as an instrument to create and perpetuate in the American company a monopoly of the telephone business; that Barton and Fish, while willing to sell a portion of said stock, insisted upon retaining two-thirds thereof. The bill further charges a series of acts done by Barton through the officers and agents that had been placed in control of the Kellogg company through

the control it had acquired of a majority of the Kellogg company stock, all of which acts are charged to be in furtherance of the illegal purpose of the American company to disorganize and dissolve the Kellogg company. The prayer of the bill was that a temporary injunction might issue, which, upon final hearing, should be made perpetual, restraining the American company, Barton, Fish and the Electric company from selling or otherwise disposing of the shares of stock which they held in the Kellogg company, aggregating 4311 shares; that a meeting of the stockholders be convened, under the direction of the court, for the election of a new board of directors, and that the holders of the stock in question be enjoined from voting in said meeting any of said shares of stock, and that the said American company, Barton, Fish, the Electric company, and all of their officers and agents, be enjoined from attempting to dissolve or otherwise interfere with the interest and business of the Kellogg company, and that the sale of the shares of stock in the Kellogg company to the American company be set aside and held for naught.

By a second supplemental bill filed by Francis W. Dunbar, Kempster B. Miller and George L. Burlingame it is charged that in January, 1907, the meeting of stockholders of the Kellogg company was held in Chicago; that all the stock of said company was represented at the said meeting either by owners or proxies, and that Milo G. Kellogg attended said meeting and nominated for election a board of directors consisting of Dunbar, Miller, Burlingame, Milo G. Kellogg, Leroy D. Kellogg, Edwards and James G. Kellogg, and that one Charles S. Holt nominated the following board of directors: Buckingham, Brush, Hanford, Dommerque, DeWolf, Edwards and Coffeen; that votes were cast for the directors as above named by Milo G. Kellogg 3405 shares, and by other persons, making a total of 3736 shares out of 4970 shares present, and that said board of directors were duly declared elected by Dunbar; that

DeWolf, as president, presided at the said meeting; that Charles S. Holt, counsel for the American company, was present and claimed to be the proxy and owner of 3305 shares of the 3405 shares so owned and voted by Milo G. Kellogg in person; that said DeWolf, acting in the interest of the American company and the Electric company, refused to recognize the vote of Milo G. Kellogg in respect to 3305 shares of stock, and claimed and pretended that the directors so chosen were not elected but that in their place and stead the second set of nominees were elected, and that said second set of directors, other than Edwards, under the direction of the American company, the Electric company and Fish and Barton, have assumed and pretended to be, and have acted as, the directors of said Kellogg company. It is averred that Milo G. Kellogg was the owner of and entitled to vote the 3305 shares of stock, and that the vote of such stock by Holt was void and of no effect. Said supplemental bill prays that Dunbar, Miller, Burlingame, Milo G. Kellogg, Leroy D. Kellogg, James G. Kellogg and Edwards may be declared elected and to constitute the duly elected board of directors of the Kellogg company, and prays for an injunction against all persons interfering with the exercise of their duties as such board. Subsequently, by amendment and supplemental bill, it was charged that on the 19th day of December, 1906, the Kellogg company declared a dividend of fifty per cent upon all its capital stock, and that said company on that date paid to such American company a dividend amounting to $215,550 upon 4311 shares of stock of said Kellogg company. The American company denied, by supplemental answer, that it had received a fifty per cent dividend, or a dividend of any per cent or any amount, on any shares of stock of the Kellogg company. A plea was interposed setting up the dismissal of the cross-bill and the affirmance thereof by this court as an adjudication that Milo G. Kellogg was not the owner nor entitled to said shares of stock, and for that reason

was not entitled to vote said shares at the stockholders' meeting on January 15, 1907.

The foregoing statement is sufficient to show the general character of the bill. The findings and decree of the circuit court may be summarized as follows: After reciting in detail the averments of the bill and finding the facts substantially as therein charged to be true, and specifically finding that the pretended purchase of 4311 shares of stock by the American company, in its necessary operation at the time it was made, tended and tends to materially suppress competition and creates in said American company and its licensee companies a monopoly in the rendering of telephone service to the public throughout the United States and in the different cities and other places thereof, and that it was the intention and purpose of said American company, in making each of the pretended purchases of said shares of stock, to so restrict and suppress competition in said telephone service and create in itself a monopoly in said service, and that said attempted purchases of stock by the American company were contrary to the public policy of the State of Illinois and void, the decree finds that no title to said stock passed thereby from any of said sellers to said American company or to said Barton, but that, despite said attempted sales, each of said sellers still remains the owner of the shares of stock so attempted to be purchased from him. The decree finds that the American company paid DeWolf, as attorney in fact of Milo G. Kellogg, for the stock obtained from him, $351,229.44, and that the said American company paid to the several owners thereof $114,036.48 for the other shares of stock, being a total of $465,265.92 which the said American company paid for 4311 shares of stock. The decree finds that on December 19, 1906, the Kellogg company declared a dividend of fifty per cent upon all its capital stock being then under the control of the American company, and on that date paid to said American company, and said American company re-

238—30

ceived, the dividend of fifty per cent upon the 4311 shares of stock which the said American company claimed to own. The dividend paid to the American company on this date was $215,550. The decree recites the proceedings of the stockholders' meeting in January, 1907, and finds that the set of directors nominated and voted for by Milo G. Kellogg were duly elected directors of the Kellogg company, and that said Kellogg was entitled to be recognized as a stockholder of the Kellogg company, with the right to vote the shares of stock attempted to be sold by DeWolf to the American company, and that the other set of directors, other than Edwards, were not elected directors of the said company. Following these findings the decree of the circuit court ordered, adjudged and decreed that Milo G. Kellogg and the other stockholders of the Kellogg company who had made a pretended sale to the American company are still severally the owners of such shares of stock, aggregating 4311 shares, and a permanent injunction is granted restraining the Kellogg company, and its agents and officers, from refusing to recognize such parties as stockholders and from rejecting the votes of any of them except in so far as the injunction might be modified, and also from recognizing and treating said American company, or any of its assigns, as the owner or owners of any of the said 4311 shares of stock; that the temporary injunction heretofore issued against the American company and others be made perpetual. The board of directors declared to have been elected by DeWolf at the January meeting are enjoined perpetually from exercising any of the powers or privileges of directors of said Kellogg company, and from in any way interfering with the conduct or management of the business affairs or the possession or control of the property, books or papers of said Kellogg company, unless hereafter duly elected such directors in said company. DeWolf and Dommerque were perpetually enjoined from acting as president and secretary, respectively, of the Kellogg company.

By the seventh paragraph of the decree it was ordered, adjudged and decreed that the American company, within ten days from the 15th day of February, 1908, deposit with the clerk of the circuit court, duly endorsed in blank or to the order of the clerk of said court, all of the certificates of stock representing or purporting to represent 4311 shares of stock so attempted to be purchased by said American company, and, if necessary to enable him to make distribution of said shares according to the decree, said clerk is authorized to surrender such certificates and that the Kellogg company should issue in lieu thereof other like certificates of stock, aggregating 4311 shares. By the eighth paragraph of the decree it is ordered, adjudged and decreed that within twenty days after said certificates shall have been deposited with said clerk, and any of said sellers to the American company of said stock shall have been served with notice of the deposit of said certificates with said clerk, said seller may deposit with such clerk a certified check upon a Chicago bank, payable to the American company, for the difference between the purchase price paid by the American company for the said stock, plus the interest at the rate of five per cent per annum thereon from the time or times when payment or payments were made to the date of said deposit of said check, and the sum of fifty per cent of the par value of said stock plus interest thereon at five per cent per annum from December 19, 1906, to the date of the deposit of said check, and upon delivery of such certified check to the clerk said clerk shall forthwith deliver to the seller so depositing such check a certificate, duly endorsed, for the number of shares so attempted to be sold by said seller to the American company and shall deliver said check to the American company. The decree names the several sellers of stock and the number of shares that each is entitled to receive under this clause of the decree. By paragraph 9 of the decree it is ordered, adjudged and decreed that in the event the said American company shall not, in

compliance with this decree, deposit the said certificates for 4311 shares of stock within ten days from the 15th day of February, 1908, the said certificates of stock for said 4311 shares shall, each of them, be, and the same are, canceled and held for naught, and the Kellogg company is directed to immediately issue and deliver to the clerk of the court new certificates for said 4311 shares of stock, such certificates to be for the several numbers of shares of stock which will permit the distribution to the several parties as in the decree contemplated, and the several sellers of such stock are permitted to receive the shares to which they are severally entitled, by depositing a check for the amount and in the manner provided in paragraph 8 of the decree, and upon his doing so the clerk shall deliver to such seller such new certificate of stock for the number of shares specified opposite his name in paragraph 8, and said Kellogg company shall have and recover from the American company the sum of $215,550, with interest thereon at the rate of five per cent per annum from December 19, 1906, crediting, however, in reduction of said judgment, all sums received by said American company in respect of dividends or interest thereon which any seller shall have applied, by way of offset, in a settlement for his stock under the provisions of the decree, and in default thereof execution to issue therefor. Any money collected by the Kellogg company on said judgment is to be held by it subject to the further order of the court, and any checks delivered to the clerk by any seller under the provisions of this paragraph shall be turned over and paid to the American company. Paragraph 10 of the decree makes provision for a public sale by the master in chancery of all or such part of the certificates of stock as should not be accepted and paid for by the sellers thereof in accordance with the preceding provisions of the decree. Out of the proceeds of the sale the master was directed to deduct his commission, and pay from the proceeds of said sale to the American company the difference between the

purchase price paid by the said American company to said seller to it, for the shares of stock so sold by the master, plus interest at five per cent on said payments from the date when they were made to the day of sale, and the sum of fifty per cent of the par value of the said stock so sold, plus interest thereon at five per cent from December 19, 1906, to the date of said sale by the master, and if there is a balance remaining in the hands of the master of said proceeds he is directed to pay it to the sellers of the stock. A provision is made in the decree modifying the injunction so as to permit the board of directors elected by the votes of the American company in January, 1907, to continue in the management of the affairs of the Kellogg company until all of the sellers of said stock shall have complied with the provisions of the decree in regard to making a deposit with the clerk to reimburse the American company in accordance with the provisions of paragraphs 8 and 9 of the decree, or until a sale of said stock. There are some general provisions in the decree intended to regulate the conduct of the affairs of the Kellogg company pending the execution of the decree which are not necessary to be set out, since they are subsidiary in their nature and intended to regulate matters of detail consistently with the general relief granted by the decree.

Upon a review of the foregoing decree by the Appellate Court for the First District the decree of the circuit court was reversed and the cause remanded to the circuit court, with directions to enter a decree in accordance with the views expressed in the opinion of said Appellate Court. The Appellate Court held that the evidence sustained the material averments of the bill, but refused to hold that the purchase of the stock by the American company was void as between the parties to the sale. It held that the sale was void as to the minority stockholders and only voidable as to Kellogg and other sellers. The decree of the circuit court was held to be erroneous in that it recognizes in

the minority stockholders the right to have the title to the 4311 shares of stock determined and adjudged upon their bill, holding that such relief could not be granted under the pleadings in this record. Another point of difference between the circuit and Appellate Courts is in regard to the election of a board of directors at the January meeting, 1907. The Appellate Court held that owing to an irregularity in the manner of voting the shares of Milo G. Kellogg the persons for whom he attempted to vote were not elected, independently of the question as to who had the right to vote said shares, and that therefore DeWolf, Hanford and Buckingham, who had previously been elected directors prior to this meeting, held over until their successors were duly elected; that eliminating the 4311 shares of stock from the January meeting there was no quorum and no election, hence the result is reached that the old board is still holding over in office under the by-laws, which provide that the directors shall hold their office until their successors are duly elected. The Appellate Court held that by the alleged sale by DeWolf of the Kellogg stock a title passed which is good until set aside, and that such sale could only be set aside on a bill for that purpose upon equitable terms requiring a return of the purchase money; that the decree dismissing Kellogg's cross-bill was an adjudication that he had no right to the stock. The relief which the opinion of the Appellate Court directs to be given is limited to a perpetual injunction against the American company from voting the stock and from receiving any dividends thereon, and a like injunction against the Kellogg company from permitting such stock to be voted by the American company or anyone representing it, and from paying such American company any dividends upon such stock.

While briefs have been filed in this court on behalf of four parties, it is apparent that there are only two real adversary interests,—the American company and those identified with it, on the one hand, and those who are seeking

to maintain the integrity and independence of the Kellogg company on the other. All the parties can readily be located on the one side or the other of this line of division. The American company, its president, Fish, and other officers and agents; the Electric company, its president, Barton, and its other officers and agents; DeWolf, and other officers and agents of the Kellogg company, who owe their official relation to it to the American company from its control of the majority of the stock of the Kellogg company, are all identified in interest with the American company; on the other hand, Milo G. Kellogg and others who made the alleged sales of stock to the American company, the minority stockholders who filed the original bill, and the board of directors for which Kellogg cast his votes at the January meeting, in 1907, represent the other side of the controversy. We will consider the several questions arising on this record with this general classification in view.

The first question which requires consideration arises on the cross-errors assigned by the American company, which call in question the findings of the circuit court that the tendency of the stock purchase by the American company was to suppress competition and that such purchase was made for such unlawful purpose. This question involves the right of appellants to any relief whatever. If appellees' contention is sustained upon this point it would necessarily follow that the judgment of the Appellate Court and the decree of the circuit court should both be reversed and the cause remanded to the circuit court, with directions to that court to dismiss appellants' bills.

A preliminary question is presented as to the degree of proof required to establish the charges in the bill. On behalf of the American company and Barton it is contended that the bill charges them with a criminal offense, in that the bill, in effect, charges a violation of sections 1 to 4 of the Anti-trust law of 1891 and sections 1 to 6 of the Anti-trust act of 1893, both of which acts are found in chap-

ter 38, sections 269a to 269t, Hurd's Revised Statutes of 1905. Without deciding what the rule as to quantity of evidence would be if a violation of the Anti-trust laws were charged in the bill, it is sufficient to say that the law of 1893 has been held unconstitutional by the Supreme Court of the United States in *Connolly* v. *Union Sewer Pipe Co.* 184 U. S. 540, and that as to the act of 1891, it is leveled against creating, entering into or becoming a party to any pool, trust, agreement or combination to fix or limit the amount or quantity of any article of merchandise or fix the price or lessen the production and sale of any such article, which offenses are not charged in the bill either by direct averment or necessary implication. The charge in the bill is that the purpose and tendency of the purchase of the stock in question by the American company were to stifle competition, and the purchase was therefore illegal and void because contrary to the public policy of this State. Whether any of the provisions of the Anti-trust act were violated by any of the parties to the transactions involved in this suit is not necessary for us to now discuss or determine. It is a sufficient answer to this contention that such violation is not charged in the pleadings, nor is it necessary to prove such offense to maintain the action or defense set up in these pleadings. It is not necessary that the proof should exclude every reasonable doubt of the truth of the averments of the bill to justify a decree in favor of appellants. Does the evidence sustain the averments of the bill upon the truth of which the unlawful character of the stock purchases depends? The evidence in this record which is largely directed to a solution of this question is very voluminous. It would not be practicable within any reasonable limits of an opinion to discuss it in detail. In the bill of appellants, as the same was presented upon the former hearing in this court and as the same stood, with some slight amendments and additions, when the cause was heard, the facts relied upon to establish the unlawful purpose and

tendency of the stock purchases were set out in detail, as will appear from the summary of those averments already set out in this opinion.

The proof shows that the American company and the Kellogg company were competitors in business, and that their fields of operation extended not only throughout the United States, but to foreign countries as well. That the American company regarded the so-called independent exchanges throughout the country as offering the most serious obstacle in the way of its complete monopoly of the telephone business in the United States cannot, under the evidence in this record, be denied. The Kellogg company manufactured multiple switchboards and other telephone apparatus and supplies and sold its products to the independent exchanges throughout the country. The interest, therefore, of the Kellogg company was identified with the independent exchanges, since they were the only customers for its products. It is shown that Milo G. Kellogg was an expert in telephony and a successful inventor of many new and valuable appliances in the telephone business. Patents for these appliances were owned and controlled by the Kellogg company and contributed much to the success both of the Kellogg company and the independent exchanges which bought and used them. The evidence shows that the independent exchanges, to the number of seven thousand, maintained friendly relations with each other through a central organization, which holds annual conventions for the purpose of discussing questions of mutual interest and with a view of advancing the interests of the independent exchanges in their rivalry and competition with the American company and its subsidiary exchanges. It is also shown that the American company controlled its licensee companies through the ownership of a majority of stock of the local Bell telephone companies, and that the local Bell telephone companies obtained their equipment entirely through the Electric company, which the American company also

controlled through the ownership of a majority of the capital stock of the Electric company. Thus the profits of the American company depended upon the number and success of its subsidiary companies. The Electric company manufactured only for the subsidiary American companies. The independent companies were compelled to procure their apparatus and equipment from independent manufacturers, the principal one of which was the Kellogg company. Continuance in business of the independent exchanges throughout the country depended upon the continued existence of the independent manufacturers of whom they could procure equipment. If the independent manufacturers should go out of business or pass under the control of the American company the independent exchanges would be reduced to the alternative of going out of business or becoming subsidiary to the American company. In addition to selling equipment to independent companies, the Kellogg company and other independent manufacturers would promote and finance the independent exchanges by furnishing money for construction purposes and taking pay in securities. This feature of the independent manufacturers was a source of no little concern to the American company.

The evidence shows that in November, 1901, Milo G. Kellogg, being much alarmed about his health, hastily placed the affairs of the Kellogg company in the hands of his brother-in-law, Wallace DeWolf, and on or about the 23d day of that month went to California, where he remained until the latter part of the following summer. The Kellogg company, and Milo G. Kellogg personally, had become liable, as endorsers, for a large amount of paper made by the Everett-Moore syndicate, and in anticipation that it would be necessary to raise money to meet these liabilities and other accruing bills of the Kellogg company, Milo G. Kellogg gave DeWolf a general power of attorney to sell or hypothecate all the shares of stock in the Kellogg company which were the individual property of Milo G. Kellogg.

The evidence shows that soon after the departure of Kellogg for California DeWolf entered into negotiations with Barton for the sale of a controlling interest in the Kellogg company. After one or two interviews between Barton and DeWolf, Barton went to New York and had a conference with Fish, the president of the American company. The result of this interview was that Barton returned to Chicago with full authority from Fish to purchase a controlling interest in the Kellogg company. The contract of sale was entered into between Barton and DeWolf on January 4, 1902. The money to pay for this stock was forwarded by Fish to Barton and by him delivered to DeWolf. The stock was assigned to Barton although he was not the real purchaser, and, so far as the record shows, had no personal interest in the transaction. It was understood and agreed between Barton and DeWolf that the transaction should be kept secret. DeWolf did not inform Milo G. Kellogg of the sale until the 4th day of July, 1902. DeWolf testifies that Kellogg was a very sick man, and that he told Barton that he had gone to California and that he doubted whether he would "ever recover." DeWolf was continued in charge of the Kellogg company, but after the sale of this stock he consulted with Barton with reference to its affairs. On July 4, 1902, DeWolf met Milo G. Kellogg in Denver, Colorado, and then for the first time told Kellogg about the sale of the stock to Barton. The evidence shows that Kellogg heartily disapproved of the course that had been taken. He entered into negotiations for the purpose of buying this stock back, but Fish and Barton refused to sell him the stock although he offered a profit of $25 per share. In the contract that was entered into between Barton and DeWolf it was stipulated that the Kellogg company should be run for one year as it had been theretofore. It was also provided in the contract that Barton should purchase any other shares of stock that might be offered, upon the same terms he had contracted for the

Kellogg stock, and under this clause the purchase of the other shares followed.

The purpose and intent of DeWolf in making this sale is not of controlling importance. Whatever his purpose may have been does not assist us in determining the buyer's purpose. It may be that DeWolf's purpose was to relieve the financial situation of the Kellogg company, which seems to have been greatly exaggerated in his estimation. At all events he makes this excuse for himself, and we are disposed to take a charitable view and accord him the benefit of his own explanation. It is certain that neither Fish nor Barton was actuated by sympathy for any real or imaginary financial distresses that surrounded the Kellogg company. The reasonable inference from the evidence in this record is, that if Barton and Fish had been sure that the Kellogg company was on the brink of financial ruin they would not have invested in this stock, but would have trusted to the desired end working itself out through the downfall and failure of the Kellogg company. We cannot conceive of the American company rushing in to aid a rival in business by investing nearly a half million dollars in the stock of a company of doubtful solvency. What, then, must have been the purpose of this purchase? In answer to this question three possible motives may be suggested: (1) The purpose may have been to acquire additional manufacturing facilities; or (2) to invest idle funds of the American company in stocks which would make a fair return upon the money; or it may have been (3) to advance the interests of the American company by lessening the competition of the independent exchanges which were being supplied with apparatus and financial aid by the Kellogg company. Let us inquire, in the light of the testimony, which of these motives actuated the American company in making this purchase.

Mr. Fish, in his testimony given in a case against the American company in New York, which was a proceeding

to set aside a contract by which the American company obtained control of the Stromberg-Carlson company, another independent manufacturing concern, testified as follows: "The question that was troubling me was not as to the value of the Stromberg-Carlson company's plant to anyone who wanted a telephone manufacturing company. We did not want a telephone manufacturing company, because we had one of our own. We have had trouble in supplying all the wants of our companies through our present sources of manufacture, but it was a trouble we could meet by the developments of our own factory." He testifies that the Electric company turned out last year a product of $69,-000,000, and these additional companies, being so small in comparison with the Electric company, would not weigh in the balance. The first motive suggested must be eliminated as entirely without the range of reasonable probability.

Was this stock purchase made as a legitimate investment of surplus funds by the American company? To this question a negative answer must be given for the following reasons: (1) The American company is not an investing company, except in the stocks of its subsidiary companies. Mr. Fish says in his testimony: "I couldn't tell you what percentage of this capital is invested in the stocks of these sub-companies. It is a very large per cent. Besides this, something over $35,000,000, if I recollect aright, is invested in the long distance lines. Of course, the company has real estate, and also, of course, a large investment in the telephones that are leased to these sub-companies. Those are the substantial items. I don't recall any of large magnitude outside of that. To no substantial extent that I remember has it been an investor in other stocks than stocks of companies connected with the telephone service. It has to a negligible extent,—to no large extent, that I recall,—all its investments of stock have been in these telephone companies, largely for the purpose of developing those companies. In the very old days there was undoubt-

edly a period when the company bought stock for the purpose of bringing them into the sphere, but it is many years since there has been any change in the relations, and since my time it has been substantially all for the purpose of developing the business of the companies whose stock was already held, and this stock buying has substantially been along that line." (2) The evidence does not show that the American company had any surplus money to invest. At the time this stock was purchased the American company was contemplating the issuance of $30,000,000 of its bonds, and within a few months after this stock was purchased these bonds were issued and sold, together with issues of its stock for the purpose of raising funds to extend its business. (3) If the American company bought this stock as an investment, why refuse to sell it to Kellogg when, within a few months after the purchase, he offered it a profit of $25 per share? This offer was refused when this litigation was threatened, and if the purchase had been made for the purpose of an investment, it is reasonable to conclude that the American company would have preferred a large profit rather than to imperil the whole investment in uncertain and vexatious litigation.

Eliminating from consideration the possible motives already suggested and considered, we are brought to the conclusion that the only conceivable purpose the American company had in making this purchase was to decrease to the minimum the competition of the independent exchanges, the existence and success of which were due in a large degree to the Kellogg company. Is there any evidence to justify this inference aside from that by which all other rational motives are eliminated?

Mr. Fish says in his testimony: "The Kellogg company and the other manufacturers for the so-called independent companies were in the habit, and are to-day, of financing them,—that is, carrying the large indebtedness and taking pay in securities. * * * I have no doubt that

in the course of the discussion [with his executive committee] I made reference to that fact, for I had frequently considered it with the executive committee before, and probably did say that with the Kellogg company run strictly as a business concern it would no longer jeopardize its own interests and hurt us by unduly financing the independent telephone companies. * * * If I said anything at all,— and I don't remember that I did say it, although I have often said the same thing to the members of the executive committee,—it was that if this arrangement were made the Kellogg company would no longer give extended credits to customers like the Everett-Moore syndicate, that were enabled to develop at the expense of the manufacturing companies from whom they bought their supplies, and to the small extent that the Kellogg company was in the field as a promoting company that was an element to be taken into account. * * * The only way in which our companies were injured by the financing by the manufacturing companies of independent telephone companies was not the competition that those independent companies, when financed, created in our field, but the *kind* of competition, which was one based upon absolutely false ideas of cost and rates that were and have been found to be impossible, * * * and when I speak of the injury to my companies, what I mean is, the plain proposition that there was an illegitimate business developed at the expense of the manufacturing companies." Again he says: "I have no doubt that we should have used our interest in the Kellogg company exactly as we used our interest in the Western Electric company, or any other interest,—to benefit our organization as a whole." Again, he testifies that it "was an advantageous investment for us to make of a small amount of money in view of our general interests." By "advantageous" he explained: "I mean advantageous pecuniarily to the American Telephone and Telegraph Company and its stockholders. The ultimate motive is everywhere and al-

ways the advantage of the American Telephone and Telegraph Company and its stockholders." He testifies that in some instances his company has incidentally fostered and advanced independent telephone companies, "and in some of them we have done it knowing what we were about," but he distinctly takes this transaction out of that class by saying: "I don't think in this we fostered or undertook to foster or advance independent interests." Again he says: "We had no purpose to save the Kellogg company from a collapse out of consideration for the independent interests." Again Mr. Fish says in his testimony: "These transactions of which you are inquiring were taken with the end in view of working out the telephone situation as well as we could. If it were practicable to work it out so as to eliminate the competition in the same territory, that would be clearly for everyone's interest, and it would have undoubtedly worked out in that way. It was our thought that by making this purchase we could get rid of this ruinous competition in the end, and be of substantial benefit not only to our company, but to the competitors to our company and the public."

In view of these admissions of the president of the American company the conclusion is irresistible that the purchase of the stock of the Kellogg company was made with the purpose and intent on the part of the American company to ultimately destroy, as far as possible, the competition of the independent exchanges which were being financed and furnished equipment by the Kellogg company. That it was contemplated that ultimately there should be an increase in the rates charged the public for telephone service as fast as the independent exchanges could be put out of business and the American subsidiary companies installed in their stead is virtually admitted by Mr. Fish in his testimony, both in respect to the Kellogg purchases as well as in his evidence in regard to the Stromberg-Carlson deal in New York. Mr. Fish's contention is that the independent

companies were furnishing service to the public from thirty per cent to thirty-five per cent cheaper than it should be. He testifies that in his opinion the so-called independent companies did not figure a sufficient sum for renewal of worn out equipment, and by thus disregarding this important factor in the telephone business the independent exchanges were engaged in "ruinous" competition.  Mr. Fish also testifies that "the American company is a dividend-paying company.  Its object is to make dividends as large as possible."  While he does not say so, it is not impossible that the desire "to make dividends as large as possible" may also be a factor which has much to do with the price which Mr. Fish thinks any well regulated telephone company ought to charge the public for telephone service.

The evidence is entirely satisfactory in this record that this stock was purchased with the intent and purpose charged in the bill, and at the time it was contemplated that the Kellogg company would cease business if the original plan and purpose had been carried out.  Mr. Fish admits that he and Barton discussed the probable loss that would result from winding up the affairs of the Kellogg company, and that it was estimated that the loss would not exceed $100,000.  That the original purpose was to wind up the affairs of the Kellogg company is manifest from a clause in the contract entered into between DeWolf and Barton, by which it was agreed that there should be a distribution of the proceeds of bills and accounts receivable to the selling stockholders.  This clearly contemplated the liquidation of the Kellogg company.  This clause of the contract was commented on by this court on the former hearing on page 23, as follows: "The averment of the bill to the effect that it is the purpose of the American company to suppress competition and create in itself a monopoly is further aided by the averment that Barton, through whom the purchase was made, agreed to pay, as part of the purchase price, so much per share in cash and the balance by apply-

238—31

ing thereto the *pro rata* proceeds of any or all bills and accounts reasonably due and owing to the Kellogg company on December 1, 1901, the same to be settled and paid to said seller as the same are paid and collected by said company, plainly indicating that a dissolution of the Kellogg company was contemplated, because in no other event could the American company appropriate the assets of the Kellogg company to pay a stockholder of that company for the stock purchased by the former company from him; also, that by the contract of purchase the Kellogg company should be carried on in the usual manner for the space of one year in order that bills and accounts receivable could be collected in the usual course of business, thus showing a purpose to dissolve the Kellogg company after the expiration of one year."

If further evidence were necessary to fix upon the American company the unlawful purpose of eliminating competition in the purchase of this stock, the fact might be pointed out that about the time this purchase of stock in the Kellogg company occurred, Mr. Epps called on Mr. Stromberg and said that he "represented one of the largest stockholders in the Kellogg company" and wanted to buy a controlling interest in the Stromberg-Carlson company. Mr. Stromberg refused to entertain a proposition to sell. Epps was sent to Stromberg by DeWolf, who admits that he had talked with Barton about it, and Barton does not deny his participation in this transaction. The evidence shows that afterwards the Stromberg-Carlson company's plant was removed to Rochester, New York, where it continued to manufacture equipment for the independent telephone companies, and that afterwards the American company again attempted to buy the Stromberg-Carlson company's plant by purchasing the control of another company which owned a majority of the stock of the Stromberg-Carlson company. This transaction resulted in a suit by the Attorney General of New York, which caused the abandonment of the proposed purchase.

If a controlling interest in these two large independent manufacturing companies could have been obtained by the American company it would have seriously crippled independent exchanges throughout the country.

Again, the evidence shows that the American company, almost immediately after the purchase of the Kellogg stock, made an attempt to get control of $275,000 of notes of the Everett-Moore syndicate. Everett and Moore were promoters. They had behind them a syndicate which had built a large number of street railways and telephone plants in Ohio, Illinois and elsewhere. About the time of the purchase of the Kellogg stock the Everett-Moore syndicate became temporarily embarrassed financially, and it was at this time and under these circumstances that the American company sought to acquire the notes of the Everett-Moore syndicate. Mr. Fish in his testimony frankly admits the attempt to obtain control of this large amount of indebtedness against a concern which was giving aid and assistance in promoting and maintaining independent telephone exchanges at a time when the Everett-Moore syndicate was temporarily embarrassed, and the reason given by Mr. Fish for desiring to obtain control of these notes is thus explained by Mr. Fish himself: "You are undoubtedly referring to the thing I referred to a short time ago, that some time in the spring there was a suggestion made that we should buy the claims against the Everett-Moore syndicate; and my further impression is that they were claims of Mr. Kellogg's and not of the Kellogg company, and that we should buy those for a substantial discount from their face value, which would give us the claims for adversary purposes, if we chose to use them in that way. By adversary purpose I mean for the purpose of taking such steps against Everett and Moore and the Federal Telephone Company as were to our interest; that we should get such advantage as there should be by coming into the possession of these creditors' claims." This circumstance is mentioned as

throwing a sidelight on the general methods of warfare against the independent telephone interests that Mr. Fish and his company sanctioned and employed. There can scarcely be any doubt that the purchase of the stock of the Kellogg company proceeded from the same general purpose which Mr. Fish confesses he had in seeking to obtain the Everett-Moore syndicate notes.

Without attempting to analyze the evidence in detail or further discussing it in general, our conclusion is that the finding of the circuit court that the purpose of the American company in making this purchase, as well as the inevitable tendency of the same, was to lessen competition in the business of furnishing the public with telephone service is abundantly sustained by the proofs. This question of fact being settled, the law applicable thereto was determined by this court upon the former hearing already referred to. It would not be necessary for us to do more than call attention to our previous decision in order to establish the general legal conclusion to be drawn from these facts, were it not that a serious difference of opinion seems to exist as to what this court really did decide on the former hearing. Appellees contend that, conceding the facts to be as found by the circuit court, still the stock purchase was only voidable, and that such contention is consistent with the previous decision of this court in this cause. This view was adopted by the Appellate Court, hence the widely different results reached by that court and the circuit court in the adjustment of the equities of the parties. We do not think there is any uncertainty or ambiguity in the language employed by Mr. Justice Wilkin in rendering the opinion of this court on the former hearing. A careful reading of that opinion will show that the right of the minority stockholders to maintain their bill is placed on two grounds: First, that there was a total want of power in the American company to purchase a controlling interest in a competing Illinois corporation. This question is discussed on pages 26

to 29 of the opinion, and it is there held, as clearly as language can express it, that no title to the stock passed by the alleged sale under the facts averred in the bill and that the "whole transaction is null and void," and that the minority stockholders had a standing in equity to restrain the pretended holders of such stock from any participation in the affairs of the company. ' A second ground upon which this court held that the bill might be maintained by the minority stockholders was, that treating the sale simply as an excessive and wrongful exercise of a power which the American company had, for the purpose of making the Kellogg company subservient to the American company, thereby freeing that company and its licensees from the competition of the Kellogg company and independent exchanges, was such a fraud against the stockholders of the Kellogg company that the plainest principles of equity gave them a right to relief. This view is presented on pages 29 to 32. The discussion of the second ground upon which the bill was maintainable in no way detracts from the force of the decision in regard to the first.

Both the American company and the Kellogg company were engaged in this State in the same general line of business. They were indirectly, if not directly, competitors in the business of supplying the public with telephone service. This business is impressed with the public use. The American company could exercise no powers in this State which could not be exercised lawfully by a domestic corporation in the same line of business. The attempt by the American company to purchase a controlling interest in the Kellogg company was unlawful. The word "unlawful,"*as applied to the purpose and acts of corporations, is not used exclusively in the sense of *malum in se* or *malum prohibitum.* It is often employed to designate powers which corporations are not authorized to exercise or contracts which they are not authorized to make,—or, in other words, such acts, powers and contracts as are *ultra vires.* Neither a foreign

nor a domestic corporation can lawfully become a stock-holder in another corporation unless such power is expressly given or necessarily implied, and especially is this true where the object is to obtain the control of such other corporation. There is no provision of our general Incorporation law authorizing one corporation to purchase and hold shares of stock in other corporations, and there is no implied power to so purchase stock in other corporations except where it is necessary to carry into effect the objects for which such corporation was formed. The purchase of a controlling interest in the Kellogg company by the American company cannot be sustained on the ground of implied power. As a general proposition, all contracts and agreements, of every kind and character, made and entered into by those engaged in an employment or business impressed with a public character, which tend to prevent competition between those engaged in like employment, are opposed to the public policy of this State and are therefore unlawful. All agreements and contracts tending to create monopolies and prevent proper competition are by the common law illegal and void. (*People* v. *Chicago Gas Trust Co.* 130 Ill. 268.) The public policy of the State on any question is to be sought for in the constitution and legislation as interpreted and expounded by the courts. Section 22 of article 4 of the constitution of 1870 provides that the General Assembly shall pass no local or special law for "granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever." This is a clear declaration that the public policy of this State is opposed to all exclusive and monopolistic franchises and powers, of whatsoever kind or character. It is also contrary to the public policy of this State to charter a corporation for the purpose of buying and selling real estate. The Connecticut Land Company was a corporation organized under the laws of the State of Connecticut and by its charter it was authorized to deal in real estate. That cor-

poration invested $500,000 in Illinois lands. In the case of
*Carroll* v. *City of East St. Louis,* 67 Ill. 568, this court held
that the Connecticut Land Company had no power to pur-
chase land in this State contrary to the public policy there-
of, and that no title passed to said company and it had no
power to pass title to its grantees. This case is an illustra-
tion of the application of the doctrine announced by this
court on the former hearing of this case, that a contract
made in violation of the public policy of this State is utterly
void. It logically follows that the attempt of the American
company to acquire the control of the Kellogg company is
void, and that the contracts entered into in pursuance of
this purpose are mere nullities, and that the title to the stock
in question never passed from the sellers to the American
company. This was, in effect, what this court decided on
the former hearing.

The next question that requires consideration is whether
the Appellate Court erred in its direction to the circuit court
in respect to the relief to be granted appellants. As already
shown, the Appellate Court limits the relief to be granted
to an injunction against the American company exercising
the rights of a stockholder and from receiving any divi-
dends upon the stock in question. A decree confined to
such relief would leave this stock in the hands of the Amer-
ican company, which is inconsistent with the previous de-
cision of this court, wherein it is held that the American
company had no corporate power to buy the stock and that
the attempt to purchase it was *ultra vires.* The interests
of the minority stockholders could not be as well protected
by allowing the American company to retain this stock as
they will by requiring this stock to be returned to its right-
ful owners. It is not conceived how it would be practicable
to continue the business of the Kellogg company with a
controlling interest in its stock tied up by injunction in the
hands of an unfriendly competitor. No method of conduct-
ing the affairs of the Kellogg company is suggested by the

opinion of the Appellate Court, and it may be that that court took the view that was urged upon this court in the oral argument, that the decree which the Appellate Court directed to be entered would, operating from the self-interest of the American company, force it to sell its holdings of Kellogg company stock. This might or might not be the result, but if the American company is allowed to sell this stock, it will, of course, determine who the purchaser or purchasers will be. A decree entered under the direction of the Appellate Court would leave the American company with liberty either to retain the stock or to sell it to any person to whom it saw fit to sell, and the purchasers from the American company would enjoy all the rights, privileges and benefits of stockholders. If the American company should sell this stock to someone who was friendly to the American company, it is not at all improbable that the decree which the Appellate Court directs to be entered would be entirely barren of any substantial relief to the minority stockholders. It seems to us that the only way any substantial and permanent relief can be given to these minority stockholders is to require the American company to surrender its stock to its rightful owners upon equitable terms. This relief the circuit court granted, and in our opinion properly so, since nothing short of this will afford the minority stockholders complete relief.

It is contended by appellees that the decree of the circuit court cannot be sustained because it grants affirmative relief to Milo G. Kellogg without a cross-bill being filed by him. When this case was before us on the former hearing it was held that the court below properly sustained a demurrer to Kellogg's cross-bill. One of the reasons then given why the decree was affirmed is found on page 32, where this court said: "We think the decree of the circuit court sustaining the demurrer to and dismissing the cross-bill is right and should be affirmed. No necessity whatever for that bill is shown. At most, Milo G. Kellogg was a

mere nominal party to the original bill. No relief was prayed against him, and if a decree granting the prayer of that bill had been rendered he would have obtained all he was in equity entitled to." The relief which Milo G. Kellogg obtains under the decree of the circuit court is a necessary incident to the complete relief to which the minority stockholders are entitled. As we have already attempted to point out, if a controlling interest in the Kellogg company is left in the hands of the American company, or some friendly ally to whom it might choose to sell, it is apparent that the interest of the minority stockholders would be exposed to all the dangers which led them to file their bill in the first instance. It therefore becomes necessary, in order to fully protect the complaining stockholders, to divest the American company of all advantages it has secured through its unlawful attempt to obtain control of the Kellogg company. When the court grants the minority stockholders adequate relief, it is clear that the relief resulting to Kellogg and other stockholders who sold to the American company is merely incidental to the main relief sought by the bill. A cross-bill is wholly unnecessary. Kellogg answered the original bill, in which he admitted all of the material averments thereof, so that there was no issue as to him to be tried and no relief was prayed against him in the original bill. In *Boone* v. *Clark,* 129 Ill. 466, this court held that a cross-bill filed by junior mortgagees, filed in a proceeding to foreclose the senior mortgage, was properly dismissed for want of equity. On page 493 this court said: "It is further insisted that at least these appellants were entitled to a decree, under their cross-bill, foreclosing their trust deed as against W. H. Colehour, and the court therefore erred in dismissing the cross-bill. The filing of a cross-bill is not necessary for the preservation of the rights of a junior mortgagee to the same premises, as has been seen; and if the appellants desire, they may, under their answer, move the court, and it will be the duty of the chancellor,—

and which may yet be done in this cause,—to preserve their rights, as against Colehour, in any surplus remaining from the sale of the property after the payment of the amount due appellees."

Again, appellees contend that the dismissal of the Kellogg cross-bill for want of equity was an adjudication of all his rights. This contention is answered by the quotation which we have already made from *Boone* v. *Clark, supra.* The dismissal of a cross-bill for want of equity, under circumstances rendering the cross-bill unnecessary in order to obtain the relief sought by it, is not an adjudication that the complainant in the cross-bill has no rights in the subject matter of the litigation. It would be a judicial outrage on the rights of Kellogg to dismiss his cross-bill on the ground that he could obtain all the rights he was entitled to under the original bill, and then deny him, upon the hearing of the original bill, such relief as he in equity is clearly entitled to, on the ground that his rights had already been adjudicated. Courts of equity were never designed to work out such unconscionable absurdities.

Again, the appellees insist that the decree of the circuit court cannot be sustained for the reason that Kellogg and the other selling stockholders are *in pari delicto* with the American company. To this we cannot assent. In the first place, the unlawful features in this transaction are largely imported into it by reason of the unlawful purpose of the American company. It was the American company that expected to profit by suppressing competition and the creation of a monopoly in this State. There is no evidence that this unlawful purpose was entertained by Kellogg or the other sellers of this stock. If it be said that DeWolf is *particeps criminis* in this transaction, it may be replied that Kellogg could not and did not attempt to authorize him to enter into a contract against the laws or public policy of the State. Kellogg gave DeWolf a power of attorney to sell his stock if necessary to raise funds to protect his in-

terest and that of the Kellogg company.  This was a perfectly legal and proper thing to do.  If DeWolf wrongfully, and in violation of the confidence reposed in him by Kellogg, entered into a secret intrigue with the representatives of the American company for the purpose of violating the laws or public policy of the State of Illinois, it cannot be said, with any show of reason, that Kellogg, who was then in California and in total ignorance of what his agent was doing in Chicago, is equal in guilt with the American company.  If wrong at all is to be imputed to Kellogg, it is only in a highly technical sense and limited degree.  He is certainly less blameworthy than the American company.  One of the exceptions to the rule that courts will not interpose to grant relief to either party to an illegal agreement where both parties stand *in pari delicto* is, that in some instances the party least blameworthy may, in furtherance of justice and a sound public policy, obtain full affirmative relief.  This principle is thus stated by Mr. Pomeroy in his work on Equity Jurisprudence, (sec. 942,) as follows: "Lastly, when the contract is illegal, so that both parties are to some extent involved in the illegality,—in some degree affected with the unlawful taint but are not *in pari delicto,*—that is, both have not, with the same knowledge, willingness and wrongful intent engaged in the transaction or the undertakings of each are not equally blameworthy,— a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more innocent, and may grant him full affirmative relief by canceling an executory contract, by setting aside an executed contract, conveyance or transfer, by recovering back money paid or property delivered, as the circumstances of the case shall require, and sometimes even by sustaining a suit brought to enforce the contract itself, or if this be impossible, by permitting him to recover the amount justly due by means of an appropriate action not directly based upon the contract.  Such an inequality of condition exists,

so that relief may be given to the more innocent party, in two distinct classes of cases: (1) It exists where the contract is intrinsically illegal and is of such a nature that the undertakings or stipulations of each, *if considered by themselves alone,* would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction and affecting the relations of the two parties which render one of them comparatively free from fault. Such circumstances are imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like, as a means of inducing the party to enter into the agreement or of procuring him to execute and perform it after it had been voluntarily entered into. (2) The condition also exists where, in the absence of any incidental and collateral circumstances, the contract is illegal but is *intrinsically* unequal; is of such a nature that one party is necessarily innocent as compared with the other; the stipulations, undertakings and position of one are essentially less illegal and blameworthy than those of the others."

But there is something else here. It must be borne in mind all the while that in this proceeding a court of equity is seeking to protect the public against an infringement of the public policy of the State, and having determined that the transactions in question in their purpose and inevitable tendency are to stifle competition and create a monopoly of a business impressed with a public character, the court will not be deterred from administering full relief by forms of procedure or technical rules which might control its action under other circumstances. Regard for the public welfare is the highest law of the land. (Broom's Legal Maxims, p. 1.) Pomeroy, in his work on Equity Jurisprudence, (sec. 941,) thus states the principle now under discussion: "Even where the contracting parties are *in pari delicto,* the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing

either party to sue for relief against the transaction, then relief is given to him. In pursuance of this principle and in compliance with the demands of a high public policy, equity may aid a party equally guilty with his opponent, not only by canceling and ordering the surrender of an executory agreement, but even by setting aside an executed contract, conveyance or transfer, and decreeing the recovery back of money paid or property delivered in performance of the agreement." The cases cited by the author in the foot notes fully sustain the text. Story's Equity Jurisprudence (13th ed. vol. 1, sec. 298,) recognizes the same principle. This author says: "But in cases where the agreement or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not, in equity, material. The reason is, that the public interest requires that relief shall be given, and it is given to the public through the party." The rule that courts will not interpose to grant relief when an illegal agreement has been made and both parties stand *in pari delicto* cannot be invoked by appellees as a defense in this case.

We have discussed the questions, both of law and fact, upon which the right of the appellants to relief depends. There are some other questions of minor importance treated in the briefs of counsel for appellees,—such as that appellants are not prosecuting the suit in good faith for their own benefit, and that there is a collusion between Kellogg and appellants,—which we have considered, but we do not deem these matters of sufficient importance to require discussion. From what has been said it follows that the decree of the circuit court is based upon a correct solution of the questions involved. That part of the decree which adjusts the equities of the parties is attacked by appellees on the ground that it proceeds from an erroneous decision of the questions involved. If the sale of stocks in question were void and no title passed, as the circuit court found and

as we have sought to show, we perceive no objection to the extent of the relief granted or the methods adopted by the circuit court to adjust the equities between the parties. No other or better method of settling this controversy occurs to us and none is suggested or pointed out by appellees. The 15th of February, 1908, the date fixed by the decree of the circuit court from which the time when the various acts in the execution of the decree were reckoned, having passed, it is ordered that all acts which in the terms of said decree were to be performed within a given number of days from the 15th day of February, 1908, shall be performed in like manner as in said decree directed within a like number of days from the 15th day of April, 1909, and that said decree of the circuit court shall be executed in all respects as therein directed, except the 15th day of April, 1909, shall be substituted for the 15th day of February, 1908.

Believing that the decree of the circuit court does justice between the parties, enforces the law and upholds a sound public policy, and that there is no reversible error therein, the decree should be affirmed. The judgment of the Appellate Court for the First District is therefore reversed and the decree of the circuit court affirmed.

*Appellate Court reversed, circuit court affirmed.*