(No. 10943.—Reversed and remanded.)
JOHN F. GOLDEN *et al.* Appellants, *vs.* JOHN A. CERVENKA
*et al.* Appellees.—WILLIAM C. NIBLACK, Appellant, *vs.*
JOHN F. GOLDEN *et al.* Appellees.

*Opinion filed April 19, 1917—Rehearing denied June 8, 1917.*

1. BANKS—*stockholder is personally liable to creditor of bank in a sum equal to amount of stock owned by him.* The liability of a stockholder in a bank to have his property taken for the debts of the bank includes both the amount which he has invested in his stock and a like amount for which he is declared personally and individually liable by the constitution, but it is only for the latter amount that he may be sued by any creditor. (*Dupee* v. *Swigert,* 127 Ill. 494, explained.)

2. SAME—*a stockholder is liable to the creditors only for obligations incurred while he is a stockholder.* The clause of section 6 of article 11 of the constitution confining a stockholder's responsibility to liabilities "accruing" while he remains a stockholder, means that the persons who were stockholders of the bank at the time credit was extended to it or a liability was incurred by it shall be individually and personally liable, as partners, to the creditors for an amount equal to their stock but not for liabilities previously incurred.

3. SAME—*capital stock and surplus must be paid in in cash before State Auditor is authorized to issue a certificate.* Before the State Auditor's certificate authorizing a bank to commence business can be issued under section 5 of the Banking act the capital stock and surplus must be paid in in cash; and the fact that a national bank is being liquidated and re-organized into a State bank, the stockholders exchanging their stock share for share, does not authorize the Auditor to waive the statutory requirement and issue his certificate for the new bank to commence business unless he is satisfied it possesses in cash the amount of its capital and surplus.

4. SAME—*object of the Banking act is to protect depositors and creditors.* The provision of the Banking act requiring the possession of the whole amount of capital and surplus in cash at the organization of a bank is for the protection of creditors and depositors, and the creditors have a right to rely upon the capital as a fund whereby the bank's indebtedness is secured and any loss incurred in its business may be made good.

5. SAME—*one who enables a bank to evade the statute requiring the capital stock and surplus to be paid in in cash is liable to cred-*

*itors.* If a person or another bank temporarily furnishes the cash or otherwise enables a new bank to evade the statute requiring·the capital stock and surplus to be paid in in cash, he or it is liable to creditors of the bank to the extent of the then existing deficit of the capital and surplus, regardless of the ·question of fraud, and upon the failure of the bank the receiver may, in equity, enforce such liability; and the creditors also have such right of action primarily, in addition to their rights against the stockholders.

6. SAME—*when a creditor may maintain bill in behalf of other creditors and against all stockholders of an insolvent bank.* A bill may be maintained by creditors of an insolvent banking corporation, on behalf of themselves and other creditors, against all the stockholders to enforce the personal liability of such stockholders, to enjoin the prosecution of suits by individual creditors against individual stockholders, to have account taken of all the liabilities of the bank, to establish the amount for which the various stockholders are liable, and to have the amount of debts proved apportioned among the stockholders.

7. SAME—*stockholders' liability to creditors is a several and individual liability on the part of each stockholder to each creditor.* The stockholders' liability to the creditors of a banking corporation is created by the constitution and is a several and individual liability on the part of each stockholder to each creditor and not a liability to the corporation or the creditors of the corporation as a class, and it is the creditors, alone, who can enforce such liability.

8. SAME—*a receiver acquires title to corporate assets, only.* A receiver of an insolvent banking corporation acquires title, through the corporation, to corporate assets, only, and as to such assets he represents the creditors, but not in relation to individual property.

9. SAME—*provision of section 11 of Banking act authorizing receiver to enforce stockholders' liability to creditors is invalid.* The provision of section 11 of the Banking act authorizing the receiver of an insolvent bank to enforce the stockholders' liability to creditors is invalid, as it is not within the legislative power to confer upon a receiver appointed in a suit brought by a public officer for the dissolution of a banking corporation, authority to enforce the rights of creditors of the bank as to indebtedness due them individually and compel stockholders to pay to the receiver their individual liabilities to such creditors.

10. SAME—*transfer of stock must be recorded on the books of bank to relieve former stockholder of his liability.* Under section 6 of the Banking act, providing for a public record of all stockholders and requiring all transfers to be recorded within ten days after the transfer is made, stock can be transferred only on the books of the

bank, and only those persons have the rights and liabilities of stock-holders who appear to be such on the books, and in order to be relieved of responsibility as a stockholder, one who sells his stock must comply with the statutory requirements for the transfer and make a demand upon the bank that the transfer be recorded.

11. SAME—*brokers and pledgees of stock are liable if they appear on the books as stockholders.* Persons who, as brokers, hold stock for the benefit of their customers, or as pledgees to secure advances of money, if they appear on the books of the bank as stockholders will be liable to creditors of the bank.

12. SAME—*what is a ratification of purchase of bank stock by agent of partnership.* Where the agent of a partnership dealing in commercial paper makes an unauthorized purchase of bank stock in the name of the firm for the benefit of a customer, the stock being transferred to the firm on the books of the bank, the acceptance of a commission from the customer by a member of the firm will amount to a ratification of the transaction and the partnership will be liable as a stockholder.

13. SAME—*section 23 of general Incorporation act does not apply to banking corporations.* Section 23 of the general Incorporation act not having been submitted to a vote of the people, as provided in section 5 of article 11 of the constitution, with respect to statutes relating to corporations with banking powers, does not apply to banking corporations.

14. SAME—*stockholders are determined by the record of bank and not the record in the recorder's office.* The record by which it is determined who are the stockholders of a bank is the record of the bank itself and not the record in the recorder's office, as stock-holders are held liable, not because of actual notice to any particular creditor that any particular person is a stockholder, but because the law imposes the liability.

15. SAME—*estate of testator is not liable as stockholder where executors have no authority to invest in bank stock.* Where a testator gives all his property to his executors, with "full power and authority to manage and control said property as they may in their judgment deem for the best interest of my estate until the same is finally disposed of and distributed as hereinafter directed," but with no specific directions as to the kind of investment, the executors' power of investment is limited to real estate or government securities, and they cannot, by investing in bank stock, impose upon the estate the liability of a stockholder.

16. SAME—*a stockholder who has paid for his bank stock twice is still liable to creditors.* The fact that a stockholder who has paid

for his stock in a national bank pays for it again in cash upon the re-organization of the bank into a State bank will not relieve him of the super-added liability created by the constitution in favor of the creditors of an insolvent bank, as such liability, being to the creditors, cannot be satisfied by payment to the bank itself; but the stockholder is entitled to a claim against the bank for the money so paid.

17. CORPORATIONS—*stockholder of a corporation is personally liable only by statutory provision.* At common law a stockholder of a corporation was not responsible personally for any of the liabilities of the corporation, and he can be held liable only because of some constitutional or statutory provision.

18. SAME—*neither foreign nor domestic corporation can hold stock in another corporation.* A domestic corporation is not authorized to hold stock in another corporation, and a foreign corporation can exercise no powers in this State which cannot be lawfully exercised by a domestic corporation.

19. SAME—*a corporation which has unlawfully purchased stock of another corporation may make defense of ultra vires.* If the act of a corporation in subscribing for the stock of another corporation is beyond its power the transaction is void, and the corporation may make the defense of *ultra vires* to a suit to enforce its liability as a stockholder even though it has benefited by the transaction, as such liability, though created by the constitution, is based upon contract.

20. INTEREST—*in equity, interest is allowed because of equitable considerations.* In equity, interest is allowed because of equitable considerations, and is given or withheld as under all the circumstances of the case seems equitable and just.

CRAIG, C. J., and CARTER, J., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. FREDERICK A. SMITH, Judge, presiding.

CHARLES LEROY BROWN, for appellants John F. Golden and others.

ALFRED S. AUSTRIAN, HENRY R. PLATT, and HIRAM T. GILBERT, for appellant William C. Niblack, Receiver.

WILLIAM A. ROGAN, and RALPH W. CONDEE, for appellant Elbridge Hanecy.

LEVINSON, BECKER, CLEVELAND & SCHWARTZ, SCOTT, BANCROFT, MARTIN & STEPHENS, CULVER, ANDREWS, KING & COOK, ZEISLER, FRIEDMAN & ZEISLER, RYAN, CONDON & LIVINGSTON, JEFFREY & CAMPBELL, KNAPP & CAMPBELL, ISADORE S. BLUMENTHAL, C. VANALEN SMITH, DELAVAN B. COLE, WALTER W. ROSS, WALTER H. JACOBS, and STEIN, MAYER & STEIN, (JEROME N. FRANK, WILLIAM D. MC-KENZIE, ROYAL B. CUSHING, and JOHN R. COCHRAN, of counsel,) for various stockholders.

JOHN BARTON PAYNE, SILAS H. STRAWN, HARRY B. HURD, and W. T. ABBOTT, for appellee the Central Trust Company.

RICHARD J. COONEY, JOHN A. VERHOEVEN, CLARENCE S. DARROW, and PETER SISSMAN, for appellees William N. Selig and others.

MOSES, ROSENTHAL & KENNEDY, (JOSEPH W. MOSES, of counsel,) for appellee James E. Bennett.

EDWARD A. DICKER, for appellee Henry C. Hackney.

Mr. JUSTICE DUNN delivered the opinion of the court:

The LaSalle Street Trust and Savings Bank, a corporation organized under the Banking act of the State of Illinois, being insolvent, ceased to do business on June 12, 1914, and on June 18 a bill was filed in the circuit court of Cook county in the name of the People of the State of Illinois, on the relation of the Auditor of Public Accounts, against it and its stockholders for its dissolution and for the appointment of a receiver. A receiver was appointed, and a decree has since been rendered dissolving the corporation and decreeing the conversion of its assets into money and the distribution of them among its creditors. After the appointment of the receiver, actions at law were begun in the superior court of Cook county and in the municipal court of Chicago by John A. Cervenka, a creditor of the

bank, against different stockholders to enforce their liability as stockholders for the satisfaction of the indebtedness of the bank to Cervenka. The appellants John F. Golden and the Importers' and Manufacturers' Company, who were creditors of the bank, filed their bill in the circuit court of Cook county, and later a second amended and supplemental bill in behalf of all other creditors of the bank who might choose to come in and prove their claims, as well as of themselves, against the bank, its present and former stockholders, Cervenka and others, to enjoin the prosecution of the suits against the stockholders brought by Cervenka, and the institution or prosecution of any other suits of like character, to ascertain the creditors of the bank and its liabilities, as well as its stockholders, and the extent of their liability to the creditors, for a decree for the amount of the stockholders' liability and the distribution of such amount among the creditors of the bank, and for the appointment of a receiver to collect such amounts from the stockholders. The receiver appointed in the Auditor's suit and the Central Trust Company of Illinois were also made parties defendant to the bill, and a decree was prayed against the Central Trust Company because of certain acts in connection with the organization of the LaSalle Street Trust and Savings Bank, to be mentioned hereafter. Various defendants answered the bill. The receiver filed a cross-bill, containing the same allegations and asking the same relief as the original bill. The cross-bill was answered, replications were filed, the cause was heard and a decree was rendered against the Central Trust Company for $1,487,854.16, and against the stockholders, respectively, for an amount equal to the par value of the respective shares of stock held by them, the payments to be made to the receiver appointed in the Auditor's suit. The complainants, the cross-complainants and some of the defendants appealed to this court, the question of the construction of the constitutional provision as to the liability of stockholders in a banking corporation

being involved. The Central Trust Company appealed to the Appellate Court and made a motion to dismiss the appeals to this court. That motion was denied at the October term, and the Central Trust Company, as well as various other defendants, assigned cross-errors on the record.

The deficiency in the assets of the bank for the payment of its creditors was greater than all its capital, surplus and undivided profits, and the court by its decree held each holder of stock in the bank at the time of its suspension individually liable to the creditors of the bank for an amount equal to the par value of his stock, and each former stockholder who had ceased to be a stockholder before the suspension also liable to an amount equal to the par value of the stock which he had previously held. The assignments of error by complainants and cross-complainants question the action of the court only in fixing the liability of the stockholders at the amount of the par value of their stock and not at twice that amount, and in not decreeing costs in favor of the complainants and cross-complainants.

Section 6 of article 11 of the constitution provides that "every stockholder in a banking corporation or institution shall be individually responsible and liable to its creditors, over and above the amount of stock by him or her held, to an amount equal to his or her respective shares so held, for all its liabilities accruing while he or she remains such stockholder." Counsel for the appellants argue that this section imposes upon the stockholders a liability for twice the amount of the stock held, relying not upon the language of the section itself, which seems at first blush clearly not to impose such liability, so much as upon the expression of the court in the case of *Dupee* v. *Swigert,* 127 Ill. 494, on page 505, that "under the section of the constitution thus quoted, every stockholder is liable for the debts of the bank to an amount equal to twice the amount of stock held by him, and may be sued for such amount by any creditor whose claim is large enough to cover it." This was not an

interpretation by the court of the meaning of this section of the constitution but the language was used in argument, only. There was no question before the court as to the amount of the liability of stockholders of a banking corporation. The action was *mandamus* against the Auditor to compel him to issue a permit to organize a bank, which he refused to do, one ground of his refusal being that the second section of the Banking act as it then stood was unconstitutional because it provided that each stockholder should be liable only for his ratable share of the debts of the bank and not for the full amount fixed by the constitution. What the court held was that such provision of the Banking act was in conflict with the section of the constitution which has been quoted, but that the constitutional provision, being self-executing, the part of the act which attempted to make each stockholder liable only for his ratable share of the indebtedness of the bank was void and the constitutional provision should be regarded as a part of the Banking act. The statement that the stockholder is liable for the debts of the bank to an amount equal to twice the amount of stock held by him is correct in the sense that his liability to have his property taken for the debts of the bank includes both the amount which he has invested in his stock and a like amount for which he is declared personally and individually liable by the constitution, but it is only for the latter amount that he may be sued by any creditor, and the statement that he may be sued for twice the amount is inaccurate. The same inaccuracy, arising in the same way, occurs in the opinion of the Supreme Court of West Virginia in the case of *Dunn* v. *Bank of Union,* 74 W. Va. 594, which is also cited and relied upon by the counsel for the appellants. The provision of the constitution of West Virginia is in substantially the same language as that of this State, and the court stated that it imposed "a personal liability on stockholders for debts accruing while they are such shareholders in a banking corporation,—a liability

thereby made personal, not as sureties but as principals, for double the amount of shares so held by each of them at the date the liability accrued." The incorrectness of this statement is made manifest by a reference to the case of *Clark* v. *Bank of Union,* 72 W. Va. 491, a case involving the same bank failure and the same effort as the case of *Dunn* v. *Bank of Union* to fix the stockholders' liability, in which the court reversed the decree and remanded the cause, saying that if the assets belonging to the bank were found to be insufficient to satisfy the debts, "the stockholders could then be assessed a sufficient amount to pay off the debts, not to exceed the par value of their stock." A similar rule as to the extent of the stockholders' liability is intimated in *Benedum* v. *Citizens' Bank,* 72 W. Va. 124, on page 141, though it is not decided, the question as to the amount of liability not being involved. In neither of the cases cited is it held that a stockholder is liable to the creditors of the bank to an amount equal to twice the amount of stock held by him.

It is clear that the language of the constitution was intended to impose upon shareholders in banks, in addition to their investment in the stock, which is, of course, liable to the creditors of the bank, a further personal responsibility to the creditors to a like amount, thus imposing upon the stockholders the double liability which was in the minds of the judges who wrote the opinions in the cases which have been cited. In the States of Colorado, Maryland, Pennsylvania and Minnesota the stockholders of banks have been held personally and individually liable to the creditors in double the amount of the par value of their stock, but in each case the statute involved expressly imposed upon the stockholders an individual liability to the creditors equal to double the amount of the stock owned. The National Banking act provides that "the shareholders of every national bank shall be held individually responsible * * * to the extent of the amount of their stock therein at the par

278 — 27

value thereof, in addition to the amount invested in such shares," and it is held that the par value of the stock is the limit of liability. (*United States* v. *Knox,* 102 U. S. 422.) The circuit court properly applied the same rule in this case.

In this immediate connection there is a further question in regard to the extent of the stockholders' constitutional liability, which may be considered here because it may affect all the previous stockholders who had ceased to be stockholders before the bank suspended.

The constitutional liability of the stockholders to the bank's creditors is "for all its liabilities accruing while he or she remains such stockholder." The court held each assignee of stock to be liable not only for the liabilities of the bank which accrued while he was a stockholder, but also for the existing liabilities which accrued prior to the time of his ownership of the stock. The stockholders who assigned cross-errors insist that it was erroneous to hold them liable for liabilities of the bank accruing before they became the owners of their stock, or to hold them for any liability which did not mature during the time of their ownership. The stockholder of a corporation at common law was not responsible personally for any of the liabilities of the corporation. He is only responsible because of some constitutional or statutory provision. Section 4 of article 10 of the constitution of 1848 provided that "the stockholders in every corporation or joint stock association for banking purposes, issuing bank notes, or any kind of paper credits to circulate as money, shall be individually responsible, to the amount of their respective share or shares of stock in any such corporation or association, for all its debts or liabilities of every kind." The provisions of special charters granted to banks before the constitution of 1870 usually contained like provisions declaring the stockholder liable for all the debts of the bank. The limiting clause added to section 6 of article 11 of the constitution of

1870 confines his responsibility to liabilities accruing while he remains a stockholder. The stockholders insist that the word "accruing," in this connection, means maturing, and they argue at some length in support of their contention. The word "accrue" may convey various meanings, dependent upon the connection in which it is used. Among the definitions of it are: "to arise; to happen; to come to pass; to become vested; to come into existence." When used in connection with a cause of action it necessarily refers to the time when a party asserting the claim can maintain an action to enforce it. By force of the term itself a cause of action does not exist until that time. But interest accrues from day to day though it may only become due annually. Though due only at stated periods, income and rent accrue constantly. So do debts, liabilities, trouble and sometimes assets. This is according to the general understanding of the term. A running account accrues with each purchase, whether credit is given or not. By whatever transaction a bank becomes liable for the payment of money, whether at a fixed time or on demand, a liability has accrued. Whether a cause of action has accrued depends upon whether the creditor could then maintain a suit. Whether a liability has accrued depends upon whether an obligation to pay has arisen. The meaning of the constitutional provision was that the persons who were stockholders of the bank at the time credit was extended to it or a liability was incurred by it should be individually and personally liable, as partners, to the creditor to an amount equal to their stock. The court erroneously held the stockholders for liabilities accruing prior to the time of their becoming stockholders.

The appellants cite in support of the decree in this particular the cases of *Thebus* v. *Smiley,* 110 Ill. 316, and *Root* v. *Sinnock,* 120 id. 350. In those cases the court was construing charters of banks which made the stockholders individually liable to the amount of their stock for all the

debts of the corporation, such liability to continue for three months after the transfer of their stock on the books of the corporation. It was held that it was not necessary to the liability of the stockholder that he should have been a stockholder at the time the cause of action accrued but it was sufficient that he was a stockholder when suit was brought. The liability because of the ownership of stock followed the stock into whosesoever hands it might go. This, however, was the liability under a charter granted prior to the adoption of the present constitution. The constitution of 1870 has changed all that by providing that the stockholder shall be responsible only for debts accruing during his ownership of the stock, and the legislature has further provided in section 6 of the Banking act that no transfer of the stock shall operate as a release of the liability. Under the constitution and the statute the stockholder is responsible to the amount of his stock for all the liabilities of the bank which are incurred during his ownership of stock and no more, and such responsibility continues until the liability is paid or otherwise discharged.

The Central Trust Company of Illinois insists that no decree should have been rendered against it for any amount. The claim against it is founded upon its connection with the organization of the LaSalle Street Trust and Savings Bank, which was organized for the purpose of taking over the business of the LaSalle Street National Bank. The latter bank was organized under the National Banking act, commenced business on May 9, 1910, and continued in business until October 21, 1912, when all its assets were transferred to the LaSalle Street Trust and Savings Bank and it ceased to do business. Its capital stock of $1,000,000 was subscribed for at the rate of $125 a share, so that it began business with a surplus of $250,000. In the summer of 1912 the officers and directors of the bank determined to convert it into a State bank. While the National Banking act provides for the conversion of a State bank into a

national bank, the State Banking act does not provide for the conversion of a national bank into a State bank. It was therefore necessary to organize a State bank which could take over the business of the national bank by purchase and assignment. The plan adopted was to organize a State bank having the same capital and surplus as the national bank, divided among the same shareholders in the same proportion, and having the same directors, officers and organization, in every particular, as the national bank. Letters were sent by the president of the bank to all its stockholders referring to the desirability of organizing the bank under the laws of the State of Illinois, so that it could deal in real estate securities and engage in other profitable lines of banking business which were not open to a national bank. It was proposed that the holders of the stock of the bank exchange their stock for an equal number of shares of the State bank stock when issued. Agreements to do this were obtained from more than nine-tenths of all the stockholders, and eventually all the stock was so exchanged. One shareholder having 133 shares declined to come into the agreement and he received the book value of his shares,—a fraction over $126 a share,—and they were transferred. The agreement for the exchange of stock in each case contained an appointment of Charles E. Ward as attorney of the stockholder to perform "all necessary acts in effecting such transfer." Meantime a permit was obtained from the Auditor of Public Accounts on October 15, 1912, to organize the LaSalle Street Trust and Savings Bank with a capital stock of $1,000,000. Stockholders owning more than 9300 shares had constituted Ward their attorney to do all necessary acts in effecting the transfer and he proposed to subscribe in their behalf for that number of shares in the new bank. Since it was proposed to borrow from the national bank all the money to constitute the capital of the State bank, and since the former bank was not authorized to lend to one person the amount repre-

sented by 9300 shares, the subscription of stock in the State bank was divided, and on October 17 it was all subscribed in the name of twenty-one individuals, nine of whom subscribed for 1000 shares each, the other 1000 shares being divided among the other subscribers. It was not intended that these subscriptions, or any part of them, should be paid, but section 5 of the Banking act required that the capital stock should all have been paid in and the Auditor satisfied, after a thorough examination, that the authorized capital had been paid in and that the bank had the full amount dedicated to the business, including the proposed surplus, before the Auditor's certificate authorizing the bank to commence business could be issued. That section requires the payment of the capital and surplus of the bank in cash before commencing business and before the issue of the Auditor's certificate. (*People* v. *Smith,* 239 Ill. 91.) In order to evade this requirement of the statute and obtain the certificate authorizing the bank to commence business without complying with it, ten persons, among whom were some of those whose names appeared as subscribers of stock, executed their several promissory notes on October 21, 1912, each for $125,000, payable to the LaSalle Street National Bank. These notes were not expected to be paid, the makers did not expect to pay and did not pay any part of them, and most of the makers were unable to pay any considerable part of them. The amounts were, however, placed to the credit of the makers, each of whom then gave his check for the same amount to the bank, which placed the aggregate amount of these checks to the credit of the "LaSalle Street Trust and Savings Bank stock account." William Lorimer, the president of the national bank, on this same day called upon Charles G. Dawes, the president of the Central Trust Company, and told him that he would want an amount of money equal to the capital and surplus of the new bank to be counted by the agent of the Auditor in compliance with the requirement of the

law and that the bank did not have that much currency.
He asked if Dawes could furnish it to him on a cashier's
check of the LaSalle Street National Bank. Dawes agreed
to do so. A check for $1,250,000 was drawn in favor
of the LaSalle Street National Bank, signed "The LaSalle
Street Trust and Savings Bank of Chicago, per Thos. Mc-
Donald, Asst. Cashier," and was accepted by the national
bank, which issued in payment of it a cashier's check of
the national bank for the same amount payable to the Cen-
tral Trust Company, which credited the amount on its books
to the LaSalle Street Trust and Savings Bank. A meeting
of the stockholders of the latter bank was then held and
fifteen directors were elected. Those directors who were
present took the oath of fealty required by the statute,
and immediately after the adjournment of the stockholders'
meeting held a directors' meeting, elected officers, adopted
by-laws and took a recess until 4:15 in the afternoon. Nine
of the directors, in accordance with the Auditor's require-
ment, made an affidavit that $1,250,000, all the capital and
surplus of the bank, "is actually paid in in cash and no part
thereof is in notes or pledges of any description, and that
said capital and surplus is now in the hands of the proper
officers of said association, as above set forth, and is to be
used by them solely in the legitimate business of the as-
sociation when the same shall be opened for banking." This
was delivered to John H. Rife, an examiner from the Aud-
itor's office, who then, accompanied by Lorimer, who had
been elected president of the bank, and Charles E. Ward,
one of the directors, went to the bank of the Central Trust
Company for the purpose of verifying the statements of the
affidavit and satisfying himself that the cash was actually
in the possession of the officers of the bank and dedicated
to the business of the bank. There $1,250,000 in currency
was delivered to Lorimer by the cashier of the Central
Trust Company. Rife counted the money and returned it
to Lorimer, together with the Auditor's certificate authoriz-

ing the trust and savings bank to commence business as a bank. Lorimer handed the money back to the cashier, who returned the cashier's check, indorsed by the Central Trust Company without recourse. Afterward, about four o'clock on the same day, at a meeting of the stockholders of the LaSalle Street National Bank a resolution was adopted authorizing a liquidation of the bank and appointing the LaSalle Street Trust and Savings Bank liquidating agent, with full power and authority to conduct such liquidation in accordance with law, under the supervision of the board of directors of the LaSalle Street Trust and Savings Bank. The board of directors of the national bank also adopted a resolution transferring to the trust and savings bank all the cash, notes, bonds, stocks, accounts and other assets of every kind of the national bank in consideration of the trust and savings bank assuming all the debts, obligations and liabilities of the national bank. Immediately after the adoption of this resolution the directors of the trust and savings bank adopted a resolution that in consideration of the transfer and assignment by the national bank of its cash, accounts receivable, bills receivable, bonds, stocks, accounts and all other assets to the trust and savings bank, the latter bank agreed to, and did, assume all the indebtedness of the national bank of every kind, and agreed to pay such indebtedness in the manner and form in which the national bank agreed to pay the same.

Under date of October 21, 1912, certificates for shares of stock of the LaSalle Street Trust and Savings Bank were issued to the original subscribers to its capital stock but were never delivered or detached from the certificate book. They were signed by the president but not by the secretary and did not have the seal of the bank attached. When shares of stock in the national bank were presented for conversion into shares of the trust and savings bank, entries were made charging the LaSalle Street Trust and Savings Bank stock account with the amount of the shares trans-

ferred at $125 a share and crediting the same amount on account of the ten notes, of $125,000 each, which have been heretofore mentioned. The result was that upon the transfer of the last of the shares of the national bank the LaSalle Street Trust and Savings Bank stock account was closed and the ten notes referred to were canceled, the trust and savings bank having, as a result of these proceedings, acquired all the assets and assumed all the liabilities of the national bank and issued its own stock in exchange for the stock of the national bank. Thus the LaSalle Street Trust and Savings Bank, instead of beginning business with a capital stock and surplus of $1,250,000 in cash, as the statute required, and without liabilities, began business on October 22, 1912, with the assets of the LaSalle Street National Bank and with all its liabilities.

Since the statute contained no provision for the conversion of the national bank into a State bank there was no provision of law for the examination of the national bank by the State authorities before the transfer. The statute contemplated only one method of organizing the State bank and only one character of assets. The Auditor had no authority to issue a certificate authorizing the bank to commence business unless he was satisfied that it possessed in cash the amount of capital and surplus named. The grant of authority to commence business was based upon the possession of the money. The affidavit of the directors stated that the money was in the hands of the proper officers, and the money was paid over to Lorimer by the Central Trust Company upon the check of the LaSalle Street Trust and Savings Bank. The object of the Banking act is the protection of depositors and creditors of the bank, and the requirement of the possession of the whole amount of capital and surplus in cash at the organization of the bank is for their benefit. Whoever becomes a creditor of the bank has a right to rely upon its capital as a fund whereby its indebtedness is secured and any loss incurred in its business

may be made good, so that the depositors or other creditors may not suffer. The elaborate system of notes, checks and book-keepers' entries, debit and credit, do not affect the substance of the transaction. They did not create any cash, and if none of those documents had been executed and none of the entries made the substance of the transaction would still have been the same, and that was, that the Central Trust Company, at Lorimer's request, permitted him to hand to the Auditor's representative $1,250,000 of the trust company's money as the money which the directors of the LaSalle Street Trust and Savings Bank had in their affidavit stated was in the hands of the officers of the bank, to be used solely in its legitimate business. Of course, the Auditor's agent was not brought there to satisfy himself that there was that much money in some bank in Chicago; and, of course, nobody thought so. The counting of the money is spoken of as a technical requirement of the Auditor, but if it is properly regarded as a technical requirement nobody could reasonably imagine that the counting of $1,250,000 of anybody's money would satisfy the requirement. It was the bank's capital and surplus about which the Auditor was required to satisfy himself, and the exhibition and delivery of the money to him was as the bank's capital, which was stated in the affidavit to be in the possession of the bank's officers and was produced from their depositary for his inspection. This amounted to a solemn declaration that the particular currency which was there present was the property of the LaSalle Street Trust and Savings Bank, dedicated solely to its business and subject absolutely to its control. The Auditor's certificate was based on this representation. All persons giving credit to the bank were entitled to rely upon the Auditor's certificate, and it is in accordance with the plainest principles of equity that no person who procured that certificate to be made could afterward be permitted to deny its truth, or the truth of his representation on which it was based, as against a

subsequent creditor of the bank who was injured by reason of its falsity. It is immaterial whether such subsequent creditor knew of the previous representation or not. If he was injured by reason of the false certificate he has a right to seek redress against those who caused it to be made. It is also immaterial whether the Central Trust Company or Dawes had any fraudulent intention, knew anything about the condition of the national bank or made any profit out of the transaction. The trust company is estopped, as against creditors who had a right to rely upon the Auditor's certificate, to deny that the cash exhibited was the property of the trust and savings bank, for which the trust company must account as a part of the bank's capital. The receiver, who represents the creditors as well as the stockholders of the bank, may in equity require the restoration of the fund for the benefit of the creditors.

Where notes or other securities have been executed to a bank for the purpose of making an appearance of assets, so as to deceive the examiner and enable the bank to continue business, although the circumstances may have been such that the bank itself could not have collected the securities, it has been held that the receiver, representing the creditors, could maintain the action, and the makers were estopped, upon the insolvency of the bank, to allege want of consideration. (*Hurd* v. *Kelly,* 78 N. Y. 588; *Best* v. *Thiel,* 79 id. 15; *Sickles* v. *Herold,* 149 id. 332, affirming 36 N. Y. Supp. 488; *State Bank of Pittsburg* v. *Kirk,* 216 Pa. 452; *People's Bank* v. *Stroud,* 223 id. 33; *Dominion Trust Co.* v. *Ridall,* 249 id. 122; *Lyons* v. *Benney,* 230 id. 117.) In one such case (*Lyons* v. *Benney, supra,*) the defense was set up by an affidavit which the court held insufficient, saying: "The substance of this affidavit of defense is that the appellant made and delivered his note to the bank in furtherance of a scheme to deceive the bank examiner, under a promise made to him by the bank that he would not be held liable upon the obligation. He agreed

that it should appear as one of the assets of the institution for the purpose of deceiving those whose duty it was to examine them, and he now sets up the defense that as it was to serve no other purpose it was to be regarded as a worthless piece of paper under this agreement with the bank. * * * So this appellant was a party to a scheme of the officers of the bank to enable them to make a deceptive and fraudulent showing of assets, and as the fraud was perpetrated upon the creditors, now represented by the bank's receiver, he can maintain an action on the note for their benefit. * * * Neither the law nor good conscience can sanction the contention of the defendant that he ought to be permitted to take advantage of the fraudulent agreement between him and the bank, to which its creditors were not parties and for whom the receiver sues."

In *McBryan* v. *Universal Elevator Co.* 130 Mich. 111, it was held that a stockholder who had made false statements that all the capital stock had been actually paid in, was liable for unpaid subscriptions to creditors of the corporation who became such creditors after he transferred his stock. In the course of the opinion the court said: "The question is, can original incorporators make a false statement as to the amount of capital stock actually paid in and escape liability for such false representations, immediately after executing the articles of association, by transferring their stock to other parties? The wrong was done by the original incorporators in making a false statement as to the amount of stock actually paid in. The public, and creditors dealing with the corporation, had the right to rely upon this statement as true. Subsequent purchasers of stock were also entitled to rely upon it as true. It would be unjust to visit the sins of the original incorporators upon subsequent stockholders who purchased in good faith. It would be a disgrace to the law if creditors dealing with the corporation in reliance upon these statements, which they examine in the public offices where they are on file, had no remedy. Jus-

tice and good morals require that they who make such false statements, whether they made them intentionally, or, as in this case, recklessly, should respond in damages therefor. The law does not permit them to evade this liability by a transfer of their stock."

Under the plan of conversion adopted no additional money was to be paid by the stockholders in the State bank but they were to exchange their stock in the national bank for stock in the State bank, share for share. This was understood by the Auditor and Rife, his agent, but such an agreement did not authorize the granting of a certificate to the bank authorizing it to commence business as a bank without a compliance with the statutory requirement of a capital paid in cash, dedicated to the business of the bank and in the possession of its officers. The statute cannot be repealed by agreement, and the inconvenience of complying with its terms does not authorize a disregard of them or the adoption of some other course of proceeding which may seem to the incorporators equally effectual to accomplish its purpose. A part of the argument in behalf of the trust company is based upon the hypothesis that the Auditor approved the conversion without the payment of any money, but this is manifestly incorrect. That it was understood that the production of the capital and surplus was required is shown by the fact that the affidavit of the directors was delivered to the Auditor's agent showing that the amount of the capital and surplus was in the possession of the officers of the bank, to be used solely in its business, and the production of the cash for his inspection. Why was this required? What was the object in producing the money to the Auditor? So far as the evidence of custom in the conversion of private or national banks is concerned, if such evidence is material, it appears that in such cases where the cash has been furnished by the banks about to be converted, actual cash was provided and placed to the credit of the new bank, and so remained, subject to the control and disposi-

tion of its officers, after the bank was authorized to commence business and until it was subsequently checked out by the authorized officers of the bank in the regular course of business. The only safeguard the State provided for the capital and surplus of this new bank was the requirement that it should be paid in cash. The Auditor could not waive this requirement and he did not attempt to do so, though if he had done so and had issued his certificate knowing that the capital of the bank had not been paid in cash it would not have lessened the liability of the trust company.

The Central Trust Company having represented that the $1,250,000 exhibited to the Auditor's agent was the property of the LaSalle Street Trust and Savings Bank, and having immediately taken and retained possession of it to the exclusion of the bank, in an action for an accounting for the benefit of the creditors of the trust and savings bank it must make good its representation and must account for the money so wrongfully taken by it. It was only obliged, however, to account to the creditors. There was no liability to the stockholders. The bank having by an evasion obtained the certificate authorizing it to commence business, did so by purchasing the assets of the national bank in consideration of the assumption of all its liabilities. It was thus provided with a capital stock, and if the value thereof was equal to the $1,250,000, which was the amount of its capital stock and surplus represented to be paid in, its creditors cannot complain. If it fell short of that amount its creditors have the right to that extent to complain of the persons who were responsible for the making of the false certificate and to require them to make good the deficiency.

Appellants contend the capital stock and surplus of the national bank were entirely worthless, and the court found in its decree that on October 22, 1912, the capital stock and surplus of the national bank had been entirely lost and its assets were not then sufficient in value to satisfy its lia-

bilities to its creditors. It is unnecessary to go into the history of the national bank. During its existence it was examined at various times by a national bank examiner and its method of doing business had been severely criticised by him. Changes had been required by the comptroller of the currency and had been promised, but the promise had not been complied with. Examinations were also made by an examiner for the Chicago Clearing House Association for the purpose of determining whether the bank should be admitted to that association. As a result of his report the bank had been advised not to make application for admission to the clearing house association as such application would be refused. For a time the bank cleared its checks through the Corn Exchange National Bank, which later refused to continue as clearing agent, and thereafter the bank cleared its own checks. The examiners who examined the bank testified as to their examinations and knowledge of the condition of the bank and expressed the opinion that its capital and surplus were not impaired. The bank was criticised because of mismanagement, because of excessive loans to officers, because of check "kiting" by the managing vice-president and because of the undesirable quality of some of the paper, but while the evidence may indicate an impairment of capital it does not show a condition of insolvency at the time of the transfer to the State bank. The appellants' contention is based largely upon the testimony of Hiram B. Kadish, an accountant, who examined the books and papers of the national bank and prepared a large number of statements summarizing the indebtedness to it and its condition at the close of business October 21, 1912, and the condition of the LaSalle Street Trust and Savings Bank. The statement of the national bank on October 21, 1912, shows its capital stock, surplus and undivided profits to be $1,267,815.72. Whether or not this amount had been impaired depends upon the collectibility of the loans which constituted a large part of the resources of the bank. In

regard to this, Kadish presented a statement showing the bills receivable held by the national bank on October 21, 1912, which remain unpaid in the trust and savings bank or were transferred by it to other banks and remain unpaid, or for which other paper which still remains unpaid was substituted, and showing the amounts paid to the receiver, allowed as set-offs and obtained by compromises. This statement showed the total debts to the national bank unpaid or transferred to other banks or accounts to be $909,-307.04, of which the receiver collected in cash, by set-offs and compromises, the sum of $161,064.61, leaving a net amount, according to this statement, of $748,242.43. Counsel for the appellants, adding to this amount items which they call "kited" checks, find an apparent total loss on assets of the national bank on October 21, 1912, transferred to the trust and savings bank, of $871,262.43. They say that if these figures could be regarded as accurately representing the impairment of the stock and surplus of the national bank they would indicate that the impairment of the capital stock was only to the extent of about $600,000, still leaving $400,000 of value. These figures certainly do not sustain a finding that the capital stock and surplus of the bank had been entirely lost and that the value of its assets was not sufficient to satisfy its liabilities to its creditors. On the other hand, an accountant who testified on behalf of the Central Trust Company in regard to the statement of Kadish, testified to certain deductions which should be made appearing on the books of the bank, which reduced the amount of indebtedness shown on Kadish's statement which was owing to the national bank on October 21, 1912, and is still unpaid, to $387,606.84. The solvency of the bank on October 21, 1912, is not, however, to be determined by the condition of the assets of the trust and savings bank on June 11, 1914. The question is not what was the value of the assets of the bank as ascertained by their final collection, but what was the value on the date of the

transfer. If upon an examination of the bank at that time, in the judgment of prudent bankers familiar with the credit of the debtors, the value of the loans of the bank was equal to the amount at which they were carried on the books of the bank, the capital of the bank cannot be regarded as impaired at that time because it eventually turned out that a portion of the loans could not be collected. If the capital stock of the national bank was impaired at the time of the transfer to the trust and savings bank, the Central Trust Company is liable to the creditors of the trust and savings bank to make good the deficiency. Upon the remandment of the cause the question of the existence and amount of such deficiency will be for decision upon the evidence to be adduced at the hearing, and upon this question the burden of proving the value of the capital stock will rest upon the Central Trust Company, which must account for the difference between such value and $1,250,000, if there is any deficiency.

Neither the bill nor the cross-bill makes any claim for interest, and the case is not one of those in which the statute provides that interest shall be allowed. In equity, however, interest is allowed because of equitable considerations, and is given or withheld as under all the circumstances of the case seems equitable and just. (*Keady* v. *White,* 168 Ill. 76.) The Central Trust Company having received funds which belonged to the trust and savings bank, if it retained them without authority of law, should account for interest from the time a demand was made for payment, which was when the cross-bill was filed. *Whittemore* v. *People, 227* Ill. 453.

It is insisted on behalf of the Central Trust Company that if there was an impairment of the capital of the national bank the original subscriptions to the stock of the State bank were not fully paid, and that the creditors should be required first to exhaust the liability of the stockholders to make good this deficiency before calling upon the Cen-

278 — 28

tral Trust Company. The liability of the Central Trust Company for the deficit in the capital and surplus of the national bank may be resorted to by the creditors of the trust and savings bank regardless of the liability of the stockholders. It is a primary liability to make good the deficiency in value of the capital stock. The one is not a substitute for the other, but the creditors may rely upon both, without regard to any question of contribution or of primary and secondary liability as between the Central Trust Company and the stockholders.

By an amendment made after the evidence was all heard the Central Trust Company alleged that the entire transaction in question was done and carried out by William R. Dawes, the cashier of the trust company, under the authority of Charles G. Dawes, its president, without the knowledge or authority of the board of directors or executive committee, and that they did not, nor did either of them, possess the authority to give away or bind the defendant to donate, hold in trust or otherwise become liable for the sum of $1,250,000, or any part thereof, with respect to the capital and surplus of the trust and savings bank or to make any representations in any way binding the trust company with respect to the trust and savings bank or its capital and surplus, and that any acts done by them of that character were beyond their authority and not binding on the trust company. The cashier of a bank has authority to receive deposits, honor checks and receive payments, and this is what is charged to have been done by the cashier of the trust company. The cashier's check of the LaSalle Street National Bank was presented to the Central Trust Company and credit given to the LaSalle Street Trust and Savings Bank, whose check was then presented and paid. These acts were all within the scope of the authority of the cashier, and in reliance on these acts the Auditor's certificate was issued showing the payment of the capital of the trust and savings bank.

On behalf of some of the stockholders various questions of procedure are presented. It is argued that all the creditors cannot join in one suit; that all the stockholders can cannot be joined in one suit; that the stockholders are entitled to trial by jury; that the receiver cannot enforce the stockholders' liability, and that the bill and cross-bill are multifarious. The objections that the creditors cannot join in one suit, that the stockholders cannot be joined in one suit and that they are entitled to trial by jury are answered by the cases of *Eames* v. *Doris,* 102 Ill. 350, *Tunesma* v. *Schuttler,* 114 id. 156, *Queenan* v. *Palmer,* 117 id. 619, and *Palmer* v. *Woods,* 149 id. 146. These cases hold that a bill may be maintained by creditors of an insolvent banking corporation, in behalf of themselves and of other creditors, against all the stockholders to enforce the personal liability of the stockholders, to enjoin the prosecution of suits by individual creditors against individual stockholders, to have an account taken of all the liabilities of the bank, to establish the amount for which the various stockholders are liable, and to have the amount of debts proved apportioned among the stockholders.

Section 11 of the Banking act provides that when it shall be ascertained, in the course of the administration of the estate of a bank in the hands of a receiver, that the assets of the bank are insufficient to discharge the entire liabilities of such bank to its creditors and the amount of the deficiency is determined, the court may, in its discretion, direct the receiver to proceed to enforce the liability of the stockholders to creditors, and that when so directed the receiver shall have the power, and it shall be his duty, to take such action, by a suit or otherwise, as the court may direct, to enforce such liability for the benefit of the creditors. The stockholders' liability created by the constitution is to the creditors of the corporation, and is a several and individual liability on the part of each stockholder to each creditor. It is not a liability to the corporation or to the creditors

of the corporation as a class, but to each individual creditor
on the part of each individual stockholder. Therefore it
is the creditors, alone, individually or collectively, who can
enforce the liability by such remedies as the law affords.
*Wincock* v. *Turpin*, 96 Ill. 135; *Runner* v. *Dwiggins*, 147
Ind. 238; *Colton* v. *Mayer*, 90 Md. 711.

The appellant stockholders contend that section 11 of
the Banking act is invalid so far as it authorizes proceed-
ings by the receiver to enforce the liability of the stockhold-
ers to creditors. On the other hand, the complainants and
cross-complainant insist that the proceedings authorized by
section 11 are merely an additional remedy, of which the
creditors, alone, can complain, and that they can complain
only on the ground that it impairs their remedy already ex-
isting. If the liability of stockholders to creditors were im-
posed by the statute the legislature might provide for the
manner in which such statutory liability should be enforced,
and might authorize the Auditor, or the receiver appointed
in the Auditor's suit, to enforce such liability and to con-
trol the proceedings for that purpose. The rights of the
creditors in such case being statutory, would be subject to
such terms as the legislature might impose, but the creditors'
rights in this case being constitutional, cannot be restricted
by terms imposed by the legislature. If the receiver can
enforce this liability against the stockholders then the de-
cree must be binding on the creditors and payment to the
receiver will discharge the stockholders. The stockholders
cannot be compelled to pay unless their payment discharges
the liability. Therefore the statute provides for the collec-
tion by a stranger of the individual debt due the creditor
and the discharge of the debtor without the creditor's con-
sent. In the case of corporations other than banks the
stockholders or a stockholder may file a bill for the wind-
ing up of a corporation in case of insolvency, but such a
suit by a stockholder is expressly forbidden in the case of
banks by section 11 of the Banking act, and only the Aud-

itor of Public Accounts, represented by the Attorney General, can file a bill to wind up the affairs of the bank. The creditors have no control over such suit and are not parties to it, except as they may become parties by making proof of their claims. The Auditor represents the creditors only so far as the assets of the bank are concerned. The receiver acquires title, through the corporation, to corporate assets, only, and as to such assets he represents the creditors but not in relation to their individual property. The creditors have a right to pursue and control their own remedies in regard to their own individual property, and did begin a suit for the enforcement of the stockholders' liability. It is an unauthorized interference with the rights of the creditors to authorize the collection of the indebtedness due to them individually by a stranger, and with the rights of the stockholders to compel them to pay to a stranger when the legislature has no authority to make the receipt of the stranger a discharge of the debt. Section 11 is invalid in so far as it authorizes the enforcement of the liability of stockholders to creditors by the receiver.

The bill and cross-bill are multifarious. This objection was made and overruled in the circuit court. We would not, after a full hearing on the merits, reverse the decree for that cause, alone. Since the decree is to be reversed for other reasons we pass upon this question. Much latitude is allowed to the sound discretion which may be exercised in determining whether causes of action or parties, or both, are properly joined in a single bill. We have already said that the joinder of all the creditors and all the stockholders is permissible. The case against the stockholders is, however, distinct from that against the Central Trust Company. The creditors are interested in both but on different grounds. In the one they seek the recovery of the capital stock of the corporation; in the other the enforcement of an individual liability in their own favor, and the evidence and grounds of recovery are different. The Cen-

tral Trust Company and the stockholders are interested in their own respective cases, only, while the receiver is concerned only with the case against the Central Trust Company. The creditors and the receiver may join in the suit against the Central Trust Company if they desire to do so. The question of multifariousness is, however, to a great extent one of convenience in the conduct of the case. Since the separation of the two cases after they have been pending so long and after a hearing would be attended with much inconvenience and expense such separation will not be required, but an order should be made on the remandment of the cause for a separate hearing of the case as to the liability of the Central Trust Company and as to the liability of the stockholders. The cause in each of its branches is of such a character as involves the examination of complicated accounts and matters of detail, and there should be an order referring the case as to the liability of the stockholders who were such during the existence of the bank but not at the time of its suspension, and as to the liability of the Central Trust Company, to different masters.

Paul F. Beich, who was the owner of 40 shares of stock in the trust and savings bank, sold them on December 23, 1913, for a full and valuable consideration, to the Midland Casualty Company, an Illinois corporation, and delivered the certificate indorsed in blank, with power of attorney authorizing the holder to cause the stock to be transferred on the books of the bank. The Midland Casualty Company has since retained the certificate and the stock was never transferred. The decree found Beich liable as a stockholder on June 12, 1914, as the last holder of the 40 shares of stock. Beich has appealed from this decree. Section 6 of the Banking act declares the liability of stockholders as fixed by the constitution, provides for a public record of all the stockholders, with the number of shares held by each, and requires a certificate of all transfers to be recorded not

later than ten days after such transfer. The object of this record is to give information as to the names of the stockholders, and persons dealing with the bank have a right to rely upon the list of stockholders shown by the record. The stock can be transferred only on the books of the association, and only those persons have the rights and liabilities of stockholders who appear to be such on the books of the association. The stockholder registered as such on the books of the bank can be relieved from liability only by a transfer of his stock on the books. (*Richmond* v. *Irons,* 121 U. S. 27.) At least he must comply with the requirements for such transfer and make a demand upon the officials of the bank that it be made.

Shares of stock were issued to some of the appellants either as brokers, to be held for the benefit of their customers, or as pledgees, to secure advances of money, and on their appeals it is insisted that the persons to whom the shares were so transferred, though appearing on the books of the bank as stockholders, are not subject to liability as stockholders on that account. These questions have been decided adversely to the appellants in the cases of *Sherwood* v. *Illinois Trust and Savings Bank,* 195 Ill. 112, and *Wheelock* v. *Kost,* 77 id. 296. A creditor is entitled to hold him liable as a stockholder who appears on the books of the corporation to be the legal owner of the stock. This proposition disposes of the assignments of error of the appellants A. E. Butler, Harris, Winthrop & Co., F. M. Zeiler & Co., Zeiler, Fairman & Co., Paul W. Cleveland, Alfred C. Gary, Henry D. Sturtevant, Elmer Wilson and Frank Cella, except so far as they were held liable for debts accruing prior to the transfer of the stock to them, respectively.

John Burnham & Co. was held liable upon shares of stock in its name on the books of the bank at various times. It is a corporation organized under the laws of the State of Maine, with authority to purchase, own, hold and sell real estate, bonds, stocks, securities, notes and obligations of

any corporation, association, society or company; to own, trade and deal with personal property of every description; to carry on a general brokerage and commission business; to act as agent and trustee, and to exercise many other powers. It is licensed to do business in Illinois, the license expressly authorizing it, among other things, to do a general brokerage and commission business, buy, sell and deal in bonds and other corporate securities, and to buy, sell or otherwise deal in corporate stocks upon a commission basis. A domestic corporation is not authorized to hold stock in another corporation, and a foreign corporation can exercise no powers in this State which cannot be lawfully exercised by a domestic corporation. (*Dunbar* v. *American Telegraph and Telephone Co.* 238 Ill. 456.) Therefore the license to John Burnham & Co. did not authorize that corporation to buy, sell or hold in the State of Illinois stock in another corporation. The purchase of such stock and its transfer to John Burnham & Co. were *ultra vires* and void. In *Converse* v. *Emerson, Talcott & Co.* 242 Ill. 619, we held that if the act of a corporation in subscribing for the stock of another corporation is beyond its powers the transaction is void and the corporation may make the defense of *ultra vires* to a suit brought to enforce against it the statutory liability of a shareholder in the other corporation. In that case the corporation which was sued was an original subscriber of shares in the Minnesota Thresher Manufacturing Company, and had held such shares, which it had fully paid for, twenty-one years, during which time it appeared on the records of the thresher company as a stockholder, but the defense of *ultra vires* was allowed and it was relieved of the stockholder's liability. In a suit against a national bank on substantially identical facts, to enforce its statutory liability as a stockholder in the same corporation, the Supreme Court of the United States sustained the same defense. (*First Nat. Bank* v. *Converse,* 200 U. S. 425.) The latter court in previous cases had laid down the

same rule. (*California Bank* v. *Kennedy,* 167 U. S. 362; *Concord First Nat. Bank* v. *Hawkins,* 174 id. 364.) The liability of the stockholders to the creditors, though created by the constitution, is based upon contract. A person who becomes a stockholder assumes a primary liability to the creditors of the corporation to an amount equal to his stock. He offers to become liable individually to the amount provided by the constitution, and is bound by contract to all persons contracting with the corporation. (*Bell* v. *Farwell,* 176 Ill. 489; Morawetz on Corporations, sec. 870; Thompson on Corporations, sec. 4790; Cook on Corporations, sec. 223.) The ownership of stock in the bank being beyond the power of John Burnham & Co., the contract was *ultra vires* and void, and the corporation was entitled to defend on that ground against an alleged liability on account of such supposed ownership, and the defense should have been sustained.

N. Crandall was a member of the firm of George H. Burr & Co., dealers in commercial paper. All the other partners were non-residents and were not served. Occasionally, upon request, they buy stock for a responsible customer. On March 12, 1913, Conrad, a salesman in the employ of the firm, at the request of P. M. Hanney purchased 100 shares of stock without the knowledge of the firm. Hanney was unable to take the stock and pay for it but did take 50 shares of it within three or four days, and the other 50 shares were sold on his account a few days later. Conrad's express instructions forbade him to put stock in the name of the firm, but this stock was transferred on the books of the bank to Burr & Co. Crandall learned of the purchase the next day, and a commission was received by the firm from Hanney of $25 for the purchase of the stock and $12.50 for its sale. This was a ratification of Conrad's purchase, and the firm was properly treated as a stockholder during the time the stock stood in its name.

What has been already said applies to the appeals of the other appellant stockholders and disposes of the questions made on their assignments of error.

Some of the appellant stockholders rely upon the provisions of section 23 of the general Corporation act, which provides that no person holding stock in any corporation as executor, administrator, conservator, guardian or trustee, and no person holding such stock as collateral security, shall be personally subject to any liability as stockholder of such corporation, but the person pledging such stock shall be considered as holding the same and shall be liable as a stockholder accordingly. The bank was not, however, organized under that act. The liability of its stockholders is declared by section 6 of the Banking act, in accordance with the constitution. Section 23 of the general Corporation act cannot apply to banking corporations, for the further reason that section 5 of article 11 of the constitution provides that no act of the General Assembly authorizing or creating corporations or associations with banking powers, whether of issue, deposit or discount, nor amendments thereto, shall go into effect unless the same shall be submitted to a vote of the people at the general election next succeeding the passage of the same and be approved by a majority of all the votes cast at such election for or against such law, and that section has never been so submitted.

Other stockholders insist that the transfer to them of their stock was not recorded in the recorder's office during the time they held the stock, and that therefore they were not stockholders of record and cannot be held liable as such stockholders. The record by which it is determined who are the stockholders of the bank is the record of the bank itself. The record in the recorder's office is a convenient method of giving notice to the public, and the law allows a period of ten days within which the transfer on the records of the bank may be filed for record in the recorder's office. The stockholders are held liable, not because of

actual notice to any particular creditor that any particular person is a stockholder, but because the law imposes the liability, and the record in the recorder's office is for the convenience of persons dealing with the bank in ascertaining who are the stockholders.

It is also contended that the Central Trust Company paid for the capital stock of the trust and savings bank, and never having transferred any of it on the books of the bank, was, in fact, the owner of all the stock, and that the persons sued as stockholders in this case cannot be regarded as stockholders. The act of the Central Trust Company was not a subscription to the capital stock of the bank or a payment for it. The character of that transaction has been already considered.

Some of the stockholders also prayed an appeal to the Appellate Court, which was denied, and they insist that this was error. The complainants and cross-complainants having prayed and perfected their appeal to this court, the stockholders, if they desired to appeal, were bound to take their appeal to the same court.

A decree was rendered against the executors of the will of Isaac L. Ellwood for $5000 as the last holders of 50 shares of stock. Ellwood, at the time of his death, owned 50 shares in the national bank. He died in 1910, leaving a will containing the following provisions:

"*Second*—I give, devise and bequeath all of my property, of whatsoever kind or nature, either real, personal or mixed, or wheresoever situated, whether owned by me now or acquired by me hereafter, to my executors hereinafter named, in trust, however, for the following uses and purposes and with the power and authority hereinafter given them: (*a*) My said executors shall have full power and authority to sell and dispose of any and all of my property, except such as is hereinafter specifically disposed of, either at public or private sale, at their discretion, meaning hereby to give to my said executors full power and authority to

manage and control said property as they may in their judgment deem for the best interest of my estate until the same is finally disposed of and distributed as hereinafter directed. And I direct that my said executors shall within ten years from the time of my decease dispose of said property and make a distribution hereunder fully carrying out the provisions of the trust herein created, and that the same be done in less time if in the judgment of my said executors the same is practicable and may be done without injury or prejudice to my estate."

William L. Ellwood, Erwin Perry Ellwood and Albert Wallace Fisk were the executors. Upon the organization of the trust and savings bank a written agreement was made agreeing to exchange the 50 shares of stock in the national bank for 50 shares in the trust and savings bank, and appointing Charles E. Ward attorney to perform all necessary acts in relation to the transfer. Though this agreement purported to bear the signatures of all the executors, the names were, in fact, all signed by one of them. Upon the organization of the trust and savings bank a certificate for 50 shares was issued to the estate of Isaac L. Ellwood. It is argued that executors have no authority, unless empowered by the will, to invest the funds of the estate in the stock of a private corporation. (*White* v. *Sherman,* 168 Ill. 589; *Penn* v. *Fogler,* 182 id. 76.) In the last case cited it was held that in the absence of specific directions in the will a trustee should invest trust funds in real estate or government securities, or if acting under the direction of the court, in such securities as it may approve, and that a trustee of a trust fund invested in national bank stock was not justified in continuing the investment in a private banking partnership which succeeded the national bank on the surrender of its charter. The executors are given power and authority by the will to sell and dispose of the testator's property, "meaning hereby to give to my said executors full power and authority to manage and control said property

as they may in their judgment deem for the best interest of my estate until the same is finally disposed of and distributed as hereinafter directed," and distribution is directed to be made within ten years from the testator's death. The will contains no power to invest in bank stock and no direction as to the kind of investment. The management and control which the executors are authorized to exercise are such as a trustee, without special authority in the instrument of his appointment, may exercise, and their power of investment is limited to investments in real estate or government securities. Since the executors were without power to invest in the stock they were without power to impose upon the estate the liability of a stockholder, and the estate therefore cannot be held liable.

Elbridge Hanecy was decreed to pay $5000 as the owner of 50 shares of stock. He owned 50 shares in the national bank, which he subscribed and paid for. He was informed by the promoters of the trust and savings bank that it was necessary to pay his subscription for stock in that bank in cash, and he did pay therefor the full amount of $6250. The liability of the stockholders is to the creditors of the corporation, and it cannot be satisfied by payment to the bank. The double payment for his share of stock created a liability for the re-payment to him of $6250, which is a valid claim against the bank but does not affect the right of the creditors to enforce the individual liability in their favor created by the constitution.

The appellants assign as error the failure to adjudge costs against the appellees, but this assignment need not now be considered.

The decree requires the stockholders to pay to the receiver appointed in the Auditor's suit the various amounts for which they were held liable. Since we have held such receiver is not authorized, by section 11 of the Banking act, to enforce the liability of stockholders, the decree is

erroneous in this respect. The order should be for the payment to a receiver to be appointed under the creditors' bill.

The decree will be reversed as to all the parties and the cause will be remanded to the circuit court, with directions to order the payments for which the parties who were stockholders at the date of the suspension of the LaSalle Street Trust and Savings Bank, on June 12, 1914, are found liable, to be made to a receiver to be appointed under the bill filed by the creditors, and for further proceedings in accordance with this opinion.

*Reversed and remanded.*

Mr. CHIEF JUSTICE CRAIG, dissenting:

The LaSalle Street National Bank gave its cashier's check to the Central Trust Company, and on that cashier's check the Central Trust Company advanced the national bank the sum of $1,250,000, which by direction of the officers of the national bank was placed to the credit of the LaSalle Street Trust and Savings Bank, the new State institution being organized. This amount was deposited to the credit of the LaSalle Street Trust and Savings Bank, was drawn by the president of the latter bank and exhibited to a representative of the State Auditor in cash as the capital and surplus of that institution, after which it was used to pay the cashier's check or obligation of the LaSalle Street National Bank, which obligation, with all other obligations of the latter, the LaSalle Street Trust and Savings Bank had assumed in the merger. As far as the Central Trust Company was concerned, it advanced this money on the credit of the LaSalle Street National Bank, which transaction was entirely proper and lawful, and similar transactions occur constantly between banks. It was in the nature of a loan from one bank to the other. In law the national bank became indebted to the Central Trust Company. The evidence of the indebtedness was the cashier's check, which remained an obligation to be collected by the Central Trust Company. The national bank was the only institution with which the

Central Trust Company had any dealings whatever. There would have been no essential difference in the transaction if the national bank had deposited or assigned certain of its notes or other assets as collateral security for this obligation or had sold them outright to secure the cash needed. It had a right to get the money in the way it did, and the Central Trust Company had a right to loan it and take the obligation of the national bank and to have it paid. Suppose the national bank had sold and transferred notes or negotiable paper held by it to the amount of $1,250,000 to the Central Trust Company and received the cash for the said notes, and after the transfer the national bank, or the State bank, its assignee, had bought back these notes with the same cash, would there have been any essential difference in the transaction? And on what theory would the Central Trust Company be liable to the creditors of the State bank if the latter bank failed two years afterwards? In this connection it must be remembered that, so far as the Central Trust Company and any of its officers were concerned, the transaction was in entire good faith and without any knowledge or intimation on their part but that the national bank was perfectly sound and solvent and the cashier's check,—the obligation which it had taken,—was perfectly good and would be re-paid. It must also be remembered that the Central Trust Company or its officers had no interest whatever in the change of the national to the State bank or in the organization of the latter bank, and the entire transaction was a mere accommodation rendered by the Central Trust Company to the LaSalle Street National Bank. It is not pretended that the officers of the Central Trust Company had any idea of deceiving or defrauding anyone. For this reason the authorities cited in support of the holding that the Central Trust Company was liable do not apply. It must also be borne in mind in this connection that at the time of this transfer the national bank was a going concern and apparently solvent. The stockholders in

that bank, with one exception, transferred their stock dollar for dollar for that in the new bank. The stock of the LaSalle Street National Bank was being bought and sold at about its book value, and after the transfer, and up to the time of the failure of the State bank, the stock of that institution was bought and sold and traded in extensively at about its book value, as shown by the record and by the large number of stockholders who bought and sold stock at different times and are denying liability. The national bank had been regularly examined by bank examiners and reports of its condition had been sent to the comptroller of the currency. These examiners were witnesses in the trial of this case in the circuit court. They had made some criticisms and recommendations as to some of its loans, but up to the time of the transfer they did not regard the institution as insolvent or even in bad shape, and it would certainly seem that if they had so regarded it they would have recommended that it be liquidated, and they, in effect, so testified. This is of some importance as showing how the bank was generally regarded or would be regarded in financial circles as to whether its obligation or cashier's check would be good. The fact that it had not been admitted to the Clearing House Association was no positive criterion as to its soundness. Even if the LaSalle Street National Bank was actually insolvent and those who effected the merger knew it, which is not shown by the evidence, the officers of the Central Trust Company had no such knowledge.

The part taken by the Central Trust Company in furnishing the cash representing the amount of capital stock has been, in my opinion, given undue importance. Section 5 of the Banking act requires that when a State bank is organized the Auditor shall be satisfied that the authorized capital has been paid in and the association has the full amount dedicated to the business. It does not require that it be paid in in cash. Such requirement simply rests on the ruling of the Auditor's department. When a national

bank or private bank is changed into a State bank it is a new organization, and while it is true there is no provision in the State Banking law, as in the National Banking act, for such merger in case of a State bank, yet these transfers or mergers have been made frequently and have been a matter of common occurrence ever since the State Banking law went into effect. In such cases what actually takes place is a merger of one institution into the other. Every bank, national, private or otherwise, has capital on which it does business. This capital is not kept intact in currency in the bank's vaults but is used in its business. It is loaned out and invested. Every bank also keeps books and makes statements showing its resources on the one hand and liabilities on the other. Its liabilities, generally speaking, are its capital stock, surplus and undivided profits, if any, and deposits which it owes to its depositors. Its assets are its cash on hand, amounts deposited with reserve agents and its notes or bills receivable. One balances the other. In other words, its capital stock and deposits are loaned out or kept in cash and with reserve agents. If the bills receivable or assets of a bank are good and collectible, and if its cash means, including what is deposited with reserve agents, and its bills receivable, together equal its liabilities represented by its capital and deposits, then the bank is solvent and its capital or capital stock is good and is actually worth the amount represented by said capital, surplus and undivided profits, generally spoken of as book value. In the case of such a bank, whether private or national, merging into a State bank, if the capital or the capital stock is good and unimpaired there can be no possible objection to exchanging such capital in the case of a private bank, or capital stock in case of an incorporated bank, dollar for dollar for stock in the new State bank; and if that is done, then the capital stock of the new institution can truthfully be said to be fully paid in dollar for dollar, and the furnishing and exhibiting of the amount of capital stock of the State bank

278 — 29

in currency is altogether a matter of form, as, ordinarily, cash equal to the capital stock of a bank is not kept on hand unless its deposits would require such amount to be so kept. Hence in this case the really vital question is, as conceded in the majority opinion, what was the actual value of the stock of the national bank at the time of the transfer or merger?—as it must be admitted that if, as a matter of fact, no matter what the form of the transaction or the part taken by the Central Trust Company or anyone else in furnishing the $1,250,000 in cash representing the capital of the new bank, the stock of the national bank at that time was unimpaired and was worth what it was represented to be by its statements, then no one was injured or affected in any way by the transaction, as the new bank, the LaSalle Street Trust and Savings Bank, started upon its business career with $1,250,000 perfectly good, unimpaired capital stock, which stock had originally been subscribed and paid in cash.

The statement of the condition of the LaSalle Street National Bank on October 21, 1912, as shown by the books of the bank, was as follows:

*Resources Oct. 21, 1912.*

| | |
|---|---:|
| Loans and discounts | $2,521,264.74 |
| U. S. bonds to secure circulation | 650,000.00 |
| Premium on U. S. bonds | 7,104.00 |
| Bonds to secure postal savings | 77,361.50 |
| Other stocks and bonds | 186,605.00 |
| Bank Bldg., furniture and fixtures | 32,000.00 |
| Overdrafts | 3,265.92 |
| Due from U. S. treasurer 5% fund | 32,500.00 |
| Cash and due from banks | 1,049,080.04 |
| | $4,559,181.20 |

*Liabilities*

| | |
|---|---:|
| Capital stock | $1,000,000.00 |
| Surplus | 250,000.00 |
| Undivided profits | 17,815.72 |
| Reserved for taxes | 6,000.00 |
| Circulation | 647,495.00 |
| Deposits | 2,637,870.48 |
| | $4,559,181.20 |

According to this statement the bank had nearly the amount of capital and surplus, $1,250,000, available at that time. If the capital stock of the national bank was not worth its book value then the capital stock of the State bank was not fully paid in as required by law, and those who subscribed to that stock are primarily liable for any deficiency as unpaid portions of their subscriptions in addition to their superadded liability as stockholders. The Central Trust Company had no interest in the organization of the bank and took no part in it that could have deceived anyone or that would injure or deceive anyone and had nothing to do with its subsequent failure. By furnishing the money in the manner aforesaid it cannot be fairly said that it or its officers were parties to a scheme to organize the new bank without capital stock, even if there was such a scheme. In my opinion it is no more liable in this case than the treasury of the United States, from which the money that was counted as the capital stock of that bank originally came. To hold the Central Trust Company liable in this case for losses to creditors caused by the failure of the bank two years after it was organized, such failure being unquestionably due to bad loans and bad management during its existence, is contrary to all reason and authority. The majority opinion concedes that the Central Trust Company is not liable for the full amount of the capital stock but is only liable for the difference between its actual value and its book value, and it seems to me that the opinion is in this respect inconsistent, because if the stock of the national bank was worth its book value then no one was injured. If it was not worth what it was represented to be, then the stock subscribers are liable to make up the deficiency.

I do not concur in the holding of the foregoing opinion that the provision of section 11 of the Banking act authorizing the enforcement of the liability of stockholders to creditors by a receiver, as provided in that section, is unconstitutional. It is true that the liability of stockholders to

creditors of the bank is created by the constitution, but does the statute in any way take away such liability or prevent its enforcement? The statute was enacted to meet modern business conditions, and its purpose is to assist in enforcing such liability and provide an additional and effective remedy for the stockholders and creditors, so that in case of the failure of a bank the assets may be collected and realized upon and the stockholders' liability be declared and the creditors paid in one proceeding, as far as possible, without a multiplicity of suits and the confusion and loss thereby entailed. In this case, which is probably a fair illustration of what may happen in any large bank failure, there are several hundred stockholders and several thousand creditors, and if it is to be left to such action as each individual interested sees fit to take, it is very certain that hopeless confusion and great expense and loss will result. Some creditors will probably sue some stockholders and many of the creditors will never be paid, unless, perhaps, some stockholders who may not be sued will advertise that fact and invite the unpaid creditors to begin action. There is nothing in the statute, reasonably construed, that is at all repugnant to the constitutional provision in question, any more than are the Practice act or other methods of procedure that have been provided by the legislature for the purpose of securing rights guaranteed by the constitution. It is true that in *Wincock* v. *Turpin,* 96 Ill. 135, in which there was a contest between a receiver and the creditors, a depositor was left free to prosecute his individual suit at law, but as stated in the opinion in that case (p. 143) : "It may be a state of facts might exist which would authorize a court of equity to bring before it all the stockholders and depositors and determine their rights and adjust equities, marshal the fund and distribute it *pro rata,* but no such case is made by this bill, and until such a case shall be made we must leave the depositors to pursue their remedies under the law." And that case was distinguished in the later case of *Eames* v.

*Doris,* 102 Ill. 350, in which it was held that there might be resort to a court of equity to enforce a stockholder's liability, and that one creditor might, at the instance of the whole body of the other creditors, be restrained from the prosecution of his individual suit where such prosecution would be to the prejudice of the equal interests of all the creditors. And this would seem to be a proper case for intervention by a court of equity.

As to the liability of Burnham & Co., while it is true that one corporation is prohibited by statute from holding stock in another corporation, the liability of Burnham & Co. as a stockholder is fixed by the constitution; and besides, it was not an investor in stock but was engaged in buying and selling stock for others as a broker, and was authorized so to do by the charter issued to it under the laws of the State of Maine. For this reason I think it was liable and that the authorities cited in support of its non-liability are not applicable. The same thing is true of the trustees of the Ellwood estate. Their liability as stockholders was a constitutional one and superior to the statute.

As to the liability of Elbridge Hanecy, it is sought to make him pay, along with other stockholders, an amount equal to the stock he held in the bank. He proved clearly, and it is not denied, that he has already paid this super-added liability. Because of the failure he lost the amount represented in the stock of the national bank which he originally subscribed for and paid in cash, and he also loses an amount equal to that which he paid in and will now have to pay another sum equal to his capital stock. In other words, he will have to lose three times the amount of his original investment whereas the other stockholders will only lose twice that amount. This is an equitable proceeding, and in equity he should be relieved from further liability as a stockholder.

For these reasons I think the decree should have been reversed as to the Central Trust Company and Elbridge

Hanecy and affirmed as to Burnham & Co. and the trustees of the Ellwood estate.

Mr. JUSTICE CARTER, dissenting:

I concur in the reasoning and conclusion of the dissenting opinion of Mr. Chief Justice Craig in so far as it tends to hold that the Central Trust Company is not primarily liable. The questions involved in this case, however, are so important that I desire to state certain other facts which in my belief strengthen this conclusion. I wish especially to emphasize the fact that all the acts of the Central Trust Company officers in connection with the organization of the LaSalle Street Trust and Savings Bank were entered into and carried on by them in the utmost good faith. The record shows this clearly, and that seems to be conceded by the majority opinion, and, practically, also conceded by counsel for the complainants, and yet, under the conclusion of the majority opinion, the Central Trust Company is held liable to the same extent as it would have been had it, through its officials, entered into the organization of the LaSalle Street Trust and Savings Bank with fraudulent purposes. In so holding, in my judgment, the majority must necessarily entirely overlook the fact that all the Central Trust Company did in connection with the organization of the new bank was performed by it in good faith, not for the purpose of evading, but in order to carry out, the requirements of the law, under the rules laid down by the State Auditor.

No question appears to have been raised by anyone before the organization of the LaSalle Street Trust and Savings Bank as to the absolute solvency of the LaSalle Street National Bank. It is true, as stated in the dissenting opinion of Mr. Chief Justice Craig, that it appears there had been some criticism by the United States comptroller's office as to the management of said national bank, but the fact that there had been such criticism, as I understand the rec-

ord, had never been made public and was known only to the directors of said national bank and the officials of the comptroller's office. I do not find the slightest evidence in the record that the solvency of the LaSalle Street National Bank had ever been questioned. Everybody, apparently, before it transferred its assets to the trust and savings bank, assumed that the national bank was solvent. Very wide publicity had been given in the press of Chicago to the fact that the LaSalle Street National Bank was to go out of business and transfer all of its assets and business to the new LaSalle Street Trust and Savings Bank. Very wide publicity had also been given to the fact that no new money was going into the new State bank when it was organized and took over the assets of the national bank. These facts had been stated in a letter to the stockholders of both banks, and in a letter, also, to the depositors of the national bank. Substantially the same facts had been published at length in articles in the *Chicago Tribune, Chicago Daily News* and *Chicago Evening Post.* It is clear, therefore, that not only the officers of the LaSalle Street National Bank and of the new trust and savings bank, but all of the stockholders, had the fullest information as to the character and nature of the transaction between the two banks and the methods proposed to be used in transferring the assets from the older bank to the new one. The State Auditor's office fully understood the proposed plan of making the transfer. According to the evidence the whole plan had been talked over with that office and approved before it was attempted to be carried out, and the Auditor's office knew, beyond question, that the change from a national to a State bank was to be made by an exchange of stock and that no new money was to be put into the new State bank. The matter of the transfer had also been taken up with the United States comptroller's office, and that office understood and sanctioned the method of transfer. The record discloses that these facts had been stated to Charles G. Dawes, the presi-

dent of the Central Trust Company, when he was asked
to furnish the cash to be counted by the Auditor's repre-
sentative at the time of the transfer. Beyond all doubt the
Auditor's representative was present when the transfer was
made and the money was paid over to the officials of the
LaSalle Street Trust and Savings Bank and when it was
re-paid by the officials of that bank to the Central Trust
Company, and he actually saw this money re-paid to the
Central Trust Company and the cashier's check of the La-
Salle Street Trust and Savings Bank taken in exchange for
the currency. Even if it had not been shown by direct evi-
dence, clearly and positively, that this was done with the
Auditor's sanction and approval, the fact that this transac-
tion took place in the office of the Central Trust Company
and not in the office of the new trust and savings bank
would, in itself, be ordinarily sufficient to indicate to the
Auditor's office that the currency offered as the paid up
cash capital of the LaSalle Street Trust and Savings Bank
was to be paid back at once to the Central Trust Company.
It seems, also, from the evidence, that the State Auditor
himself had suggested that this requirement of counting the
currency was merely a technical one, but must be complied
with, in accordance with the rule of his office, in order to
obtain his approval of the proposed exchange. There is
not a scintilla of evidence that indicates that the State Aud-
itor was deceived in any way as to the character of the
transaction, or that any scheme had been entered into by
anyone to deceive him as to the nature of the transfer or
the use to which the currency furnished by the Central
Trust Company was to be put.

From these facts, which are uncontradicted in this rec-
ord, it is clear that whatever was done by the Central Trust
Company to assist in transferring the assets of the LaSalle
Street National Bank was not calculated, on the face of
the transaction or in reality, to deceive or defraud anyone
or in any way to try to evade the law. On the contrary,

all these steps were taken with the full knowledge of both the State and Federal officials, and were manifestly carried on for the purpose of complying with the law and all the requirements of the officials in connection with such transfer.

The majority opinion says: "The Auditor had no authority to issue a certificate authorizing the bank to commence business unless he was satisfied that it possessed in cash the amount of capital and surplus named." I cannot agree that the statute makes any such requirement. It is true that the rule of the Auditor's office required that the full amount of the capital stock should be in the possession of the bank, in the shape of currency, so that it could be counted by the State Auditor, apparently to relieve the State Auditor of any responsibility as to the real value of the paid up capital stock. Section 5 of chapter 16a of our statute on banks provides: "When the directors have organized, as in section 4 of this act, and the capital stock of such association shall have been all fully paid in and record of the same laid before the Auditor, he shall by himself or some competent person of his appointment, make a thorough examination into the affairs of such association, and if satisfied the authorized capital has been paid in, and that the association has the full amount dedicated to the business, including proposed surplus, if any, * * * he shall give them a written or printed certificate under seal authorizing them to commence the business designated in section 1 of this act." (Hurd's Stat. 1916, p. 124.) It will be noted that this statute merely says that the capital stock shall be paid in and does not provide how the payments shall be made. But even though the statute does require the construction that the capital stock must be paid in money, it surely does not contemplate that it must always remain money. I understand from the evidence in this record, under the law, that when a corporation, whether bank or otherwise, is to be organized, certain persons, as

stockholders, usually subscribe for the capital stock and be-
come legally liable to pay their subscriptions in full in cash.
But the corporation does not wish to merely collect these
subscriptions and hold them in its treasury. To do so
would defeat the very purpose of the organization, for the
business could not, in that way, bring in any profit. As
fast as subscriptions are paid in, ordinarily they are used
for the purpose of carrying on the business for which the
organization was created. It frequently happens that a
body of individuals owning property or business determine
to incorporate and to arrange that the corporation shall
take over such property or business and issue to the former
owners stock of the new corporation in place of such prop-
erty or business, and thus follow out, in effect, the theory of
the full payment of the stock subscription. In accordance
with the practice of the State Auditor's office, each one of
these stockholders would be required to pay his subscription
in money. The new corporation would then purchase the
property or business from these subscribers and re-pay to
them the amount of their subscriptions therefor. Both of
these acts would be done practically at the same time, and
if this be done, the money would actually be passed back
and forth across the table to complete the transaction; and
because of this, the courts have been more and more re-
garding the substance, and not the form, of the transaction
in organizing a corporation. In *Brant* v. *Ehlen,* 59 Md.
29, it was said: "The right of the company to purchase
coal land for mining purposes and to pay for it out of the
subscriptions to its capital stock is conceded. If so, what
reason can there be to require that the money for the stock
shall, in fact, be paid to the company and at the same mo-
ment to hand it back to the vendor in payment of the land?
The passing of the money backwards and forwards would
be an idle form, and so the courts regard it." This court
said in *Farwell* v. *Great Western Telegraph Co.* 161 Ill.
522, on page 532: "There have arisen much controversy

and litigation as to whether payment for the issue of stock may be made by labor, property, work under contract, or valuable consideration other than money. It is not now questioned that it may be done in the absence of statutory provisions requiring payment to be made in cash." In *Searight* v. *Payne,* 74 Tenn. 283, the court said: "To go through the mere form of paying in the money and immediately paying it out for the property would not in any way facilitate the business or aid the after-creditors of the firm nor furnish them any additional security for their debts." (See to the same effect the *Spargo case,* L. R. 8 Ch. 407; *Harvey Watts Co.* v. *Worcester Umbrella Co.* 78 N. E. Rep. (Mass.) 886; 10 Cyc. 472.) Under the authorities in this and other jurisdictions it is customary and legal for a new corporation to organize and take the payments of the subscription to the capital stock, partly or all, in the property or business of individuals or of another concern. There was, therefore, nothing extraordinary or uncommon in attempting to organize the LaSalle Street Trust and Savings Bank by having its subscriptions to the capital stock paid by the assets and business· of the LaSalle Street National Bank, and the mere fact that this was being done without paying in any new cash would in no way put the officials of the Central Trust Company· on inquiry that anything was being done irregularly, or that the LaSalle Street National Bank was not solvent, or that the entire transaction was not of a *bona fide* character and entered into in good faith by all connected therewith.

But conceding, for the purpose of this case, that the law requires, as intimated in the majority opinion, that the stock must all be paid in cash and that the officers of the Central Trust Company knew that to be the law, that fact would in no way weaken the conclusion, on this record, that the entire transaction, so far as the Central Trust Company was concerned, was performed in good faith. Experienced bankers of Chicago testified on this trial that when a new

bank was organized for the purpose of beginning new business, with no intention of taking over the assets of another institution, methods practically similar to those adopted here have often been followed; that ordinarily the capital stock was subscribed for by a large number of persons, who send to the officers of the bank, or those in charge of its organization, their checks drawn on various other banks for the amount of their subscriptions to the capital stock. These checks are not currency. They are credits, since the relation between a bank and its depositor is merely that of debtor and creditor. These checks, however, are regarded and usually called cash in the ordinary commercial world. After all the subscribers have thus paid for their capital stock the Auditor appears for his preliminary examination and informs the organizers of the bank that these checks, although they may be perfectly good in the commercial world, will not be counted by him as the capital of the bank; that those who want to organize the bank must procure currency for these checks. Thereupon the organizers of the bank go to some large and well established banking institution and deposit these various subscribers' checks to the credit of the new bank. After this is done the new bank still has no currency, but merely one credit in a large bank instead of a number of credits in various banks. The new bank then draws its check upon this large depositary bank and the money is produced for the representative of the State Auditor to count, and when the counting of the currency is completed it is immediately re-deposited to the credit of the new bank in this same depositary bank, so that when the new bank begins business, instead of having its capital and surplus in currency, it has it, according to the testimony of these witnesses, in the form of a credit in another bank, which credit is just as good as, and no better than, the responsibility of the bank in which the moneys are deposited. Now, if it is true that the Central Trust Company in this case must be held liable to the creditors for fraud, then by

the same line of reasoning, where a new bank is organized as above outlined, any depositary bank in such a transaction as just outlined is violating the law in allowing the cash to be taken and counted by the State Auditor and having it then returned at once and giving a credit therefor to the new bank. It is apparent that all connected with this transaction knew of this practice as to the organization of a new bank, and that all connected with this transfer, including United States and State officials, understood that they were following the usual practice in counting this cash and allowing it to be returned to the Central Trust Company. It is manifest, therefore, that no one was attempting to evade the law or deceive the Auditor, or anyone else, by the use to which the currency furnished by the Central Trust Company was being put in connection with the transfer, in the organization of the LaSalle Street Trust and Savings Bank.

The majority opinion cites some seven or eight opinions in support of its reasoning that the Central Trust Company is liable on the facts stated in the record. The case of *Hurd* v. *Kelly*, 78 N. Y. 588, fairly illustrates these several cases. In that case a bank was in financial difficulties or in a condition unsatisfactory to the public authorities. For the purpose of enabling the bank to continue its business certain persons delivered their obligations to the bank in order that such obligations might appear as a part of its assets. By reason of this the bank was enabled to go on in business and the public continued to extend it credit. The bank thereafter failed and a receiver was appointed. The makers of these obligations sought to repudiate them by claiming that they were executed without consideration, and the court held that while perhaps the bank itself might not recover under the obligations, the receiver, as the representative of the creditors, could. The difference between that class of cases and this is manifest, for in such cases the makers of such obligations were knowingly participat-

ing in an actual deception and apparently entered into the transaction for the purpose of deceiving the public officials, knowing that these obligations would be treated as a part of the assets of the bank. In this case how different are the facts! As already stated, there was no attempt to deceive and no thought of deceiving, and apparently by this record no one was deceived. To hold, as does the majority opinion in this case, that the Central Trust Company is liable under the circumstances, it seems to me, is to relieve the State officials of all duty and responsibility in such questions in deciding whether the actual assets of the older bank are worth the paid up capital stock of the new bank.

In view of the evidence in this record I cannot agree with the majority opinion that "all persons giving credit to the bank were entitled to rely upon the Auditor's certificate, and it is in accordance with the plainest principles of equity that no person who procured that certificate to be made could afterward be permitted to deny its truth, or the truth of his representation on which it was based, as against a subsequent creditor of the bank who was injured by reason of its falsity. It is immaterial whether such subsequent creditor knew of the previous representation or not." It seems to me that here is an intimation, contrary to the facts in this case, that the Central Trust Company fraudulently assisted, for the purpose of deception, in procuring this certificate from the Auditor. The theory upon which the majority opinion is based, if that theory is sound in principle, is, it seems to me, that a subsequent creditor, having been misled by those connected with the organization of a bank, lent credit to the bank because he was so misled. But here is a statement in the majority opinion that even though such creditor has not been misled and knew the history of the entire transaction, still, in equity, the Central Trust Company, because it took part in the organization of the LaSalle Street Trust and Savings Bank, would be held

liable to such creditor.   To so hold, it seems to me, is
contrary to all principles of equity and justice, especially
the holding in the majority opinion that it is immaterial
whether the Central Trust Company or its officers had any
fraudulent intention or knew anything about the condition
of the LaSalle Street National Bank or made any profit
out of the transaction.   This doctrine makes the Central
Trust Company an insurer as to the actual assets of the
LaSalle Street National Bank and all subsequent creditors,
regardless of whether the subsequent creditors were misled
or deceived by the part the trust company took in the or-
ganization of the LaSalle Street Trust and Savings Bank.

I can understand how it may be reasonable to conclude
that because a bank is doing business that affects public in-
terests public policy should require everyone connected with
its organization to see to it, for the protection of innocent
creditors, that the actual stock is paid in full value, but I
can conceive of no reason why a creditor should be pro-
tected by any such strict rules, on the grounds of public
policy, if he understood fully as to the nature of the trans-
action and the part that all had taken in connection there-
with.   I can also understand why there might be reason,
on grounds of public policy, for holding the Central Trust
Company ultimately liable to innocent creditors who had
been misled, but there does not seem to me to be any
ground for holding the Central Trust Company primarily
liable to all creditors, whether they had been misled or not.
To so hold, as does the majority opinion, places the same
responsibility upon the Central Trust Company as should
be placed by law, and is placed under this decision, upon
the stockholders of the LaSalle Street Trust and Savings
Bank.   Neither the Central Trust Company nor its officials
occupied any fiduciary relation with reference to the cred-
itors in the organization of the trust and savings bank.   The
stockholders did occupy such fiduciary relation.   It was the
duty of the stockholders to know all about the transaction,

and it is apparent from this record that they did know all about it, and knew the part that the Central Trust Company took in transferring the assets of the old national bank and its business to the new State bank. It seems to me that there should be a clear distinction drawn between the actual participants—the parties in interest—and an outsider—a stranger—who does an act within the strict line of banking business to assist the real parties in interest. I see no reason, either on the grounds of public policy or on any other basis, why the stockholders should not be held to a greater responsibility than the Central Trust Company. Surely, the majority opinion is going too far in holding the Central Trust Company primarily liable, thereby, in effect, holding that said company was acting in a fiduciary capacity in advancing this cash. The stockholders should first be primarily liable, to the extent of their constitutional liability, to all the creditors. If the Central Trust Company is held at all, it should only be held liable secondarily to innocent creditors for any such amount as it may not be possible to collect from the stockholders, but should, under no circumstances, be charged with greater liability than this. To hold, as does the majority opinion, the Central Trust Company and its officials primarily liable in this case is, it seems to me, going much farther than any well considered opinion has gone heretofore and is disregarding entirely the difference between the responsibility of a person who occupies a fiduciary relation and one who is practically an innocent third party to a given transaction. This holding is far-reaching in its consequences, and will, in my judgment, if followed hereafter, involve many innocent persons in loss and do violence to all principles of equity.